**Robert P. GIORDANO, M. D., Plaintiff,**

v.

**Richard L. ROUDEBUSH, Administrator of Veterans' Affairs, Veterans' Administration, John Chase, Eugene Caffey, Jr., Louis Polumbo, T. E. Corcoran, Richard Bjork, Robert Pepiot, and the United States of America, Defendants.**

Civ. No. 76–141–1.

United States District Court,
S. D. Iowa,
Central Division.

May 19, 1977.

On Motion for Determination of Back Pay April 12, 1978.

Richard G. Santi and Lance A. Coppock, Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, Iowa, for plaintiff.

Roxanne Barton Conlin, U. S. Atty., Des Moines, Iowa, for defendants.

## MEMORANDUM OPINION

WILLIAM C. STUART, Chief Judge.

The above entitled action, filed April 23, 1976 was presented on its merits commencing December 21, 1976. Appearing for plaintiff were Richard G. Santi and Lance A. Coppock. Appearing for defendants were George H. Perry then acting United States Attorney for the Southern District of Iowa and Edward F. McCarten, attorney for the Veteran's Administration. Defendants reply brief was filed December 28, 1976. After having heard the evidence and the arguments of counsel, examining all matters filed including the testimony and exhibits, and being fully advised in the premises the Court makes the following findings of fact and conclusions of law.

### The Facts

Dr. Robert P. Giordano, a Board Certified Urologist of considerable academic and practical experience and training, was appointed in October of 1973 as a staff physician in the Veterans Hospital in Des Moines, Iowa. This appointment, as assistant chief of the Urology section was made under the provisions of Title 38, United States Code section 4104, which together with section 4106 provides that such employment shall be for a probationary period of three years. At the time of this appointment the section chief was Dr. Robert Puntenney. Approximately eleven months after Dr. Giordano was appointed, Dr. Puntenney was transferred to the V.A. hospital in Phoenix, Arizona thus leaving Dr. Giordano as the only qualified staff Urologist, aside from those in the residency training programs. Prior to his transfer, as section chief, Dr. Puntenney was required to prepare a proficiency report or evaluation of Dr. Giordano as a probationary employee. On January 27, 1975 Dr. Puntenney prepar-

ed his first proficiency report on Dr. Giordano and his performance was rated satisfactory. However, by letter dated December 2, 1974, Dr. Puntenney after his transfer to Phoenix, had contacted Dr. Louis Palumbo and stated in pertinent part as follows:

I have deliberately postponed completion of the proficiency report on Dr. Giordano in order that I can develop a valid rationale in the hopes that it will prevent being overly critical of his performance during the preceding year.

During the past year I have had the opportunity to observe Dr. Giordano in his daily performance as an Assistant Chief, Urology Section at the Des Moines Veterans Hospital. As you are aware due to the several times I have discussed his performance with you in order to seek advice, the general level of his performance has been less than satisfactory. It is because of this possible preconceived bias, if you will, that I suggest that a final rating not be based strictly upon my report, but rather incorporate into the final rating the evaluation of others that may have come in contact with this individual.

There followed an extensive and detailed discussion of Dr. Puntenney's perception of deficiencies in Dr. Giordano's performance. An additional proficiency report was prepared on Dr. Giordano in October of 1975 by Dr. Palumbo in which his performance was rated as unsatisfactory.

The Urology section administratively is under the Surgical Services branch, in Des Moines, headed by the Chief of Surgery, Dr. Palumbo. Approximately six months after Dr. Giordano's appointment, problems began to develop between Dr. Giordano and Dr. Palumbo and perhaps others on the staff of the V.A. hospital. During the fall of 1974, Dr. Palumbo denied Dr. Giordano permission to go to the Broadlawns Polk County Hospital to assist in organizing a Urology clinic. In January of 1975 another problem arose concerning whether certain examinations should be conducted in the Outpatient Clinics as suggested by Dr. Giordano or within surgical services as advocat-

ed by Dr. Palumbo. Subsequent to the occurrence of other differences, in July of 1975 Dr. Giordano placed in writing what he felt to be the substantial causes of dispute and submitted it to Mr. Pepiot, the hospital director. This memo, dated August 25, 1975, was made available to Dr. Palumbo. In addition, on August 25, 1975 Dr. Palumbo requested, pursuant to V.A. rules and regulations governing probationary employees, the convening of a Professional Standards Board to review Dr. Giordano's performance. Mr. Pepiot felt that since he was unable to resolve these largely personal and professional differences that he should request outside assistance from V.A. Central Office in Washington, D. C.

On September 9, 1975 Dr. Robert Condon visited the Des Moines V.A. and interviewed some 16 people including Dr. Giordano and Dr. Palumbo. On September 15, 1975 he submitted a detailed report to Dr. Carl Hughes, Director of Surgical Services, Central Office. This report was not made available to Dr. Giordano until subsequent to his discharge. The Condon report suggested that three alternatives be offered to Dr. Giordano: "In order to restore an effective working environment within the Surgical Service at Des Moines VAH, Dr. Giordano must be removed." The alternatives offered were (1) to resign; (2) to transfer to another VA hospital; or (3) face a Professional Standards Board with potentially unfavorable results. Both Mr. Pepiot and Dr. Corcoran indicated to Dr. Giordano that he had very little chance of "getting past" a Professional Standards Board. Dr. Giordano would not resign or accept a transfer.

On September 26, 1975 Dr. Giordano received a letter from Dr. Corcoran advising him that a Professional Standards Board would be convened October 10, 1975 comprised of Des Moines V.A. hospital personnel. Upon objection by Dr. Giordano and his attorney, on October 16, 1975 Mr. Pepiot responded by letter that permission had been granted by V.A. Central Office to appoint an independent review board.

On November 25, 1975 Dr. Giordano received from Dr. J. J. Matoole, Chairman of the Professional Standards Board in Omaha, Nebraska, notice that such Board would convene in Des Moines on December 10, 1975. The notice listed the general areas in which a proficiency evaluation indicated performance deficiencies. These areas included (1) compliance with established tours of duty, (2) response and compliance with V.A. policies and procedures, (3) personal conduct, and (4) interpersonal relationships during working hours.

The Board met in Des Moines on December 10, 1975. Dr. Giordano was called but was not allowed to be present during other witness' testimony to cross-examine the other witnesses nor was he allowed to be represented by counsel. The report of the Omaha Board was forwarded on December 23, 1975 to Mr. Pepiot. Essentially it was the finding of the Omaha Board that "[t]he Board was unable to corroborate to its satisfaction the existence of deficiencies considered to be of sufficient significance to justify recommending termination of employment". This Board report, as with the Condon report, was not made available to Dr. Giordano until after his discharge.

After receiving the recommendation of the Omaha Board, Mr. Pepiot requested a secondary review by the established Professional Standards Review Board, Central Office, Washington, D. C. According to Mr. Pepiot, upon review by the hospital director and a determination of disagreement, it is within his discretion to request additional review by Central Office. Dr. Giordano was not informed of this decision by either Mr. Pepiot or Central Office.

Upon forwarding this report Mr. Pepiot included a cover letter delineating his disagreement with the conclusions of the Omaha Board and specifying certain alleged incidents concerning Dr. Giordano. Dr. Giordano was not granted access to this letter nor was he aware of its contents which included statements in substance as follows:

1. I have reviewed the Professional Standards Review of Dr. Giordano's evaluation and feel there is still justification why Dr. Giordano should not be continued as an employee of this hospital.

2. On many weekdays it is impossible for either Dr. Palumbo, Dr. Corcoran or myself to contact Dr. Giordano, either by telephone or by paging. Secretaries have been unable to find him and as witnessed by his own testimony, he has not been available at all times in the clinic where he is needed. His statement which states he can usually be found in the hospital or the library, I feel is false. Those are the first places we look—his office, library, surgery, etc.

3. The personal relationships between he and Dr. Palumbo are so strained that I feel it is impossible to get them back together again. This is true in the cases of many other staff members who either totally ignore or avoid Dr. Giordano.

On January 23, 1976 Mr. Pepiot forwarded another letter to Dr. Caffey which contained additional documentation of incidents involving Dr. Giordano subsequent to the convening of the Omaha Professional Standards Board. Again Dr. Giordano was not aware of this letter or its contents.

Dr. Eugene Caffey, Jr., Chairman of the Professional Standards Review Board, Central Office, Washington, D. C. first became aware of the problems concerning Dr. Giordano in the fall of 1975 when the request came in for the appointment of the independent Professional Standards Board from Mr. Pepiot. From the time of this request Dr. Caffey received a variety of communications from several sources concerning the disposition of Dr. Giordano's case. Most occurred prior to the convening of the Omaha Board, however, several communications were directly from Dr. Palumbo and Mr. Pepiot subsequent to the time Mr. Pepiot forwarded the Omaha report to Washington.

The Omaha report was received by Dr. Caffey and distributed to Dr. Pareira and Dr. LeGolvan. After receiving this report and the other documentation referred to above, two meetings were held at which a variety of material was considered relative to the action to be taken in Dr. Giordano's case. Included was the material from Mr. Pepiot and the Condon report, neither of which had ever been made available to Dr. Giordano or his attorney despite request and demand. These materials were considered by the Secondary Board. Also reviewed were the complaints of Dr. Palumbo and the amplification by Dr. Puntenney of his reasons for Dr. Giordano's proficiency report.

The Secondary Board reversed the Omaha decision and recommended separation because of:

1. Unavailability on too frequent occasions for patient care and supervision of residents; and

2. The constitutional inability both intellectually and emotionally to adapt to group institutional practice.

Separation was approved by Dr. Chase for "failure to qualify and perform satisfactorily" during the probationary period. Specifically the Secondary Review Board found that the Omaha Board:

did not sufficiently support their recommendation that Dr. Giordano's probational appointment be continued and that their recommendation remarks raise questions as to the worthiness of Dr. Giordano to D.M.S. It is noted that the Omaha Board did not take cognizance of the carefully documented evaluation of Dr. Giordano by Dr. Puntenney.

It is the opinion of the CO Board that the well documented evaluations of Dr. Giordano by the former Chief of Urology, the Chief of Surgery, the Hospital Director, the site visitor appointed by CO Surgical Service, Dr. R. Condon, Chief of Surgical Service, VAH Wood, Wisconsin, attest to his unfitness for continued service in DM&S.

On February 19, 1976 Dr. Giordano was given notice that his probationary employment was terminated for failure to qualify and perform satisfactorily, effective February 21, 1976. On April 23, 1976 a complaint was filed in this Court seeking damages, production of material under the Freedom of Information Act, 5 U.S.C. § 552 and

injunctive relief. On June 18, 1976 a hearing was held on plaintiff's motion for injunctive relief at which time Count II (Freedom of Information Act) was effectively mooted by defendants' production of Mr. Pepiot's cover letter. On June 23, 1976 plaintiff's motion for a preliminary injunction or alternatively for summary judgment was denied. On November 22, 1976 cross-motions for summary judgment, plaintiff on Count II and defendant on the entire complaint, were denied. The question of attorney's fees under Count II was reserved pending final disposition.

## Conclusions of Law

As stated in plaintiff's trial brief, the primary question before the Court is whether Dr. Giordano was entitled to a due process hearing prior to his discharge. To evaluate this constitutional claim this Court must first determine whether the interest asserted herein rises to the level of a constitutionally protected property or liberty interest. Cf. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Stretten v. Wadsworth Veterans Hospital, 537 F.2d 361, 365 (9th Cir., 1976). If no such interest exists the analysis need proceed no further because there would be no right to procedural due process. If a constitutionally protected property or liberty interest exists, the Court must then further determine what due process is constitutionally required.

■ Plaintiff was a probationary employee under the provisions of Title 38, United States Code section 4106. As such there exists no legitimate claim of entitlement to nor reasonable expectation of continued employment creating a property interest which would require a due process hearing. Churchwell v. United States, 545 F.2d 59, 61 (8th Cir., 1976). Cf. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). The plaintiff in this case concedes this fact.

■ Plaintiff claims, however, that his discharge deprived him of an interest in liberty because such discharge imposes upon him a stigma which forecloses future employment opportunities thus entitling him to a due process hearing. If such be the case, a hearing with some measure of procedural rights and protections must be accorded. Cato v. Collins, 539 F.2d 656 (8th Cir., 1976).

■ Without doubt the liberty interest to be protected "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life . . . and generally to enjoy those privileges recognized at common law as essential to the orderly pursuit of happiness by free men". Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). In Board of Regents v. Roth, supra, the Supreme Court made it clear that " '[w]here a persons good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)". Board of Regents v. Roth, supra, 408 U.S. at 573, 92 S.Ct. at 2707. Thus, the Supreme Court has attempted to establish a line of demarcation between those liberty interests protected under the Roth decision and all other interests which are not. Those interests in "good name, reputation, honor, or integrity or those interests which impose a stigma or other disability foreclosing freedom to take advantage of other employment opportunities are protected interests while, on the other hand, all other interests short of such stigma or disability are not protected.

In Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court held that a liberty interest was not infringed when the only loss suffered at the hands of the government is a "stigma" or damage to reputation. Unlike Davis, however, plaintiff has in this case, in addition to the alleged stigma, suffered the tangible loss of being dismissed as an assistant section chief in Urology. Thus Paul v. Davis, supra, is inapplicable.

■ Other courts have, in addition, distinguished between the *Roth* stigma of moral turpitude which infringed the liberty interest, and charges of incompetence or inability to get along with coworkers which do not. *Stretten v. Wadsworth Veterans Hospital,* supra, at 366. So, in the final analysis a careful consideration of the precise interest involved, and of the nature, ramifications and implications of the reasons given for discharge is imperative. Further, inquiry must be had into the actual or potential disclosure of allegedly stigmatizing information. See *Cato v. Collins,* supra.

Plaintiff was discharged, upon recommendation of the Central Office Secondary Review Board, for "failure to qualify and perform satisfactorily". This separation was approved by the Chief Medical Director, Dr. Chase. Notification of such discharge was placed in plaintiff's personnel file as shown by Form S.F. 50. In addition there is maintained by the Central Office, Veterans Administration a list of former employees whose employment has been terminated. This list is distributed to all V.A. installations. Such installations are to contact the V.A. before hiring anyone whose name is on the list.

Although the defendant's answers to Interrogatories eight and nine are not without ambiguity, the Court reads them as defining the scope of the dissemination of information concerning V.A. employees as follows:

(1) If the prospective employer is a non-federal employer, only information specifically consented to by Dr. Giordano will be released to it, except the reason for discharge as found on S.F. 50.

(2) If the prospective employer is an agency of the federal government, the V.A. would release to such agency from Dr. Giordano's personnel file his

> name, present and past position, titles, grades, salaries, duty stations as well as the tenure of the employee, Civil Service Status, length of service in the V.A. and other Federal Government agencies, if applicable, and the date and reason for

the separation as shown on the Notification of Personnel Action, Standard Form 50 (VA form 5–4650) which, in this case, was for 'failure to perform satisfactorily . . . .'.

(3) In addition, V.A. employees who are responsible for the employment of physicians have the list of discharged employees available to aid them in making "informed employment determinations regarding those physicians . . . who previously have been found either not to qualify or who did not perform satisfactorily for the V.A.".

■ The Court is of the opinion that under all the facts and circumstances of the case the disclosure of information which, as a practical matter, Dr. Giordano would necessarily be forced to consent to, would create a stigma upon him which would foreclose his freedom to take advantage of future employment opportunities, and therefore, his constitutionally protected liberty interest is such that he is entitled to a due process hearing. *Churchwell v. United States,* supra; *Cato v. Collins, supra; Greenhill v. Bailey,* 519 F.2d 5 (8th Cir., 1975). The three times set forth above will be discussed in reverse order.

It seems clear that other V.A. hospitals will have information in the personnel file and board action folder available. It contains damaging information which Dr. Giordano should have had the opportunity to rebut. This situation seems to be within the circumstances which would constitute a deprivation of liberty under *Roth.*

> The state, for example did not invoke any regulations to bar respondent from all other public employment in state universities. Had it done so, this, again, would be a different case. For [[t]o be deprived not only of present government employment but of future opportunity for it certainly is not small injury. . . .' The Court has held, for example, that a State, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities in a manner . . . that contravenes . . . Due Process.

*Board of Regents v. Roth, supra,* 408 U.S. at 573, 574, 92 S.Ct. at 2707.

Although there was no absolute bar to V.A. employment by the rules and regulations here, the procedure of circulating the list and making inquiry about doctors previously terminated makes it obvious that all derogatory information about the doctor in the personnel file will be available to the inquiring V.A. hospital. This alone would foreclose or at least severely handicap employment opportunities in a substantial number of institutions throughout the country.

Federal agencies other than the V.A. which are prospective employers will only be told that Dr. Giordano was "separated for failure to qualify and perform satisfactorily during the probationary period". Many cases have held that the release of such information does not deprive a person of a constitutionally protected liberty interest entitling him to a due process hearing. *Stretten v. Wadsworth Veterans Hospital,* supra; *Gray v. Union County Intermediate Education District,* 520 F.2d 803 (9th Cir., 1975); *Shirck v. Thomas,* 486 F.2d 691 (7th Cir., 1973); *Russell v. Hodges,* 470 F.2d 212 (2d Cir., 1972). However, the consequences of the release of this limited information does not have the same effect on every classification of employees. Because the Court's reasoning is the same for federal employers, and non-federal employers, further development of this concept will be applicable to both.

Dr. Giordano is a highly specialized physician and surgeon. It is naive and unrealistic to believe that any hospital, university or practicing physician would give serious consideration to employing or associating with Dr. Giordano without a full disclosure of his past record. His refusal to consent to the full release of information would only raise the specter of much more serious misconduct than that contained in the personnel file. He would have no real choice except to consent to the release of his personnel file and the board action folder. Both contain unexplained stigmatizing charges, which would have a substantial impact upon his employment opportunities. I am persuaded that Dr. Giordano should be afforded the opportunity to make his position a matter of record in an effort to abate the effect upon his liberty interest of the stigmatizing information.

The procedure followed at the Professional Standards Board satisfied substantial due process requirements. It decided in Dr. Giordano's favor. However, after appeal to the Professional Standards Review Board, information was made available to the appeal board which Dr. Giordano had never seen and to which he had no opportunity to respond. Due process requires that he be given such opportunity. The Court is therefore of the opinion that the decision of the review board should be set aside and that Dr. Giordano should be given the opportunity to reply in writing or orally, at the discretion of the review board, to the information which had not been made available to him. Under the circumstances, substantial due process does not require confrontation of witnesses or other trial procedures.

## Back Pay and Reinstatement

Dr. Giordano was a probationary employee with no tenure or other property interest in his position at the hospital. As a probationary employee he could be terminated without cause. *Board of Regents v. Roth,* supra; *Churchwell v. United States,* supra; *Cato v. Collins,* supra; *Casey v. Roudebush,* 395 F.Supp. 60 (D.Md.1975). Cf. *Arnett v. Kennedy,* supra. He would have had no right to a constitutional due process hearing but for the stigmatizing statements contained in his files. The Court has held that he is entitled to an opportunity to refute or explain those statements so that the review board will have a fair record upon which to make a decision and his opportunities for future employment will not be unconstitutionally limited. The Court will retain jurisdiction to determine all damage issues including back pay after the Professional Standards Review Board has acted upon the appeal in compliance with this ruling and order.

*Attorneys Fees*

▮ With respect to the issue of attorney fees under the Freedom of Information Act, 5 U.S.C. §§ 552 the Court is of the opinion that plaintiff is entitled to an award of $650 in connection with Count II of the original complaint. See *Kaye v. Burns*, 411 F.Supp. 897, 901–02 (D.C.).

IT IS THEREFORE ORDERED that the decision of the Professional Standards Review Board terminating Dr. Giordano during his probationary period is set aside.

IT IS FURTHER ORDERED that the review board shall provide Dr. Giordano with a statement of all information to which he had not had access at the time the decision to terminate him was reached in order that he may have an opportunity to refute or explain the same.

IT IS FURTHER ORDERED that the review board shall establish a procedure designed to afford Dr. Giordano a fair opportunity to present his case which shall include, but need not be limited to, a written presentation by his counsel with supporting affidavits and other exhibits. If counter affidavits are permitted, Dr. Giordano shall be given the opportunity to reply to any new matter contained therein.

IT IS FURTHER ORDERED that the review board shall consider the appeal from the decision of the Omaha Professional Standards Review Board upon the complete record developed as a result of the procedure established and reach a decision regarding Dr. Giordano's termination based thereon.

IT IS FURTHER ORDERED that this Court reserves jurisdiction to determine all damage issues until the decision of the review board.

IT IS FURTHER ORDERED that attorneys fees in the amount of $650 should be and they hereby are awarded to plaintiff's counsel.

The Clerk of the Court is authorized and directed to enter judgment in accordance herewith.

**ON MOTION FOR DETERMINATION OF BACK PAY**

Plaintiff's motion for determination of back pay came on for hearing March 6, 1978. The Court now makes the following Ruling and Order.

On February 19, 1976, plaintiff, a medical doctor on probationary status, was discharged from his employment as assistant section chief, Department of Urology at the Veterans Administration Hospital in Des Moines, Iowa. Plaintiff brought this action alleging, among other things, that the discharge procedures used by the VA violated his constitutional right to procedural due process contained in the Fifth Amendment to the United States Constitution. Plaintiff sought a declaration of the invalidity of his discharge, a due process hearing and the award of back pay from the date of the original discharge.

This Court in its opinion filed May 19, 1977 found that plaintiff's constitutional right to procedural due process had been violated because his personnel file, upon which the decision to terminate was made, contained stigmatizing material that had not been made available to him and his liberty interests were infringed upon because he had had no opportunity to explain or refute these allegedly untrue charges. The Court set aside the decision of the Professional Standards Review Board terminating Dr. Giordano and ordered a system of review designed to provide him an opportunity to clear his good name. Ruling on the question of back pay was reserved until the VA had acted in response to the Court's Order.

On December 16, 1977, the Washington, D. C. Professional Standards Review Board, on a 2 to 1 vote, affirmed the decision of the Omaha Professional Standards Board rendered December 23, 1975 which recommended that Dr. Giordano be retained. Dr. John Chase, the Chief Medical Director of the Veterans Administration, who had signed the original discharge order and is a defendant in this lawsuit, refused to follow the recommendation of the second review board and, by letter dated January 12, 1978, again ordered plaintiff's discharge.

It is plaintiff's position that, as it has been determined he was entitled to a due process hearing before his discharge because of the stigmatizing material, he is entitled to the equitable relief of back pay from his wrongful discharge until he received a due process hearing. Support for this position is found in the Per Curiam ruling on the petition for rehearing in *Wellner v. Minnesota State Junior College Board*, 487 F.2d 153, 157 (8th Cir. 1973):

Wellner was improperly discharged because he was not accorded an appropriate hearing. His termination was therefore a nullity and he remains on the payroll until a proper hearing is held, at which time he may be retained or not reappointed. It is not within our province to speculate that after a proper hearing clearing his reputation the Board will recommend that Wellner not be reappointed, or that the appropriate official will not reappoint him to a similar teaching position. In any event, Wellner remains on the payroll and is entitled to receive the wages he will have earned until his name is cleared by proper Board action and the decision is properly made with respect to whether he will be reappointed. However, any award shall be reduced by interim earnings he may have derived from other employment.

This language indicates that an award of back pay is required when a nontenured employee has been discharged without a due process hearing. However, the Eighth Circuit cases grant back pay as equitable restitution of salary unlawfully withheld. *Brown v. Bathke*, 566 F.2d 588, 593 (8th Cir. 1977). It is not a punitive award. In *Wellner* the trial court found that the stigmatizing information, upon which the discharge was based was false. The equities were clearly with the plaintiff.

Subsequent Eighth Circuit cases have not awarded back pay for the period of time between the wrongful discharge and a later hearing automatically. In *Owen v. City of Independence*, Missouri, 560 F.2d 925 (8th Cir. 1977) back pay was allowed only to the date plaintiff would have had to retire. The Court said:

As we have noted, Owen's age bars him from qualifying to serve further as chief of police, so vindication of his good name could not restore Owen to this job at this time. Moreover, in light of the findings by the district court that the city manager, prior to April 17, 1972, had decided to discharge plaintiff for reasons which apparently did not relate to Owen's honesty or integrity, a full backpay remedy would afford Owen a windfall at the expense of the municipality and the municipal taxpayers. A person deprived of constitutional rights by the Government is entitled to relief only to the extent of the harm sustained, *Codd v. Velger, supra*, 429 U.S. [624] at 628, 97 S.Ct. [882] at 884 [51 L.Ed.2d 92]; to the extent that the constitutional violation causes no injury, no remedy is called for, *Mt. Healthy City School District v. Doyle, supra*, 429 U.S. [274] at 285, 97 S.Ct. 568 at 575 [, 50 L.Ed.2d 471.]

In *Brown v. Bathke, supra*, a nontenured teacher, whose property rights were violated when she was terminated prior to the expiration of her current contract, was awarded back pay only for the remainder of her contract period (about two months) although it was about two years before she was given a hearing.

The Supreme Court has held that only nominal damages can be recovered for violation of one's constitutional rights in the absence of proof of actual injury stating:

[T]he elements and prerequisites for recovery of damages appropriate to compensate injuries caused by deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another. * * * [T]hese issues must be considered with reference to the nature of the interests protected by the particular constitutional right in question.

*Carey v. Piphus*, —— U.S. ——, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

Therefore, the Court believes that before back pay can be granted, plaintiff must establish that under all the facts and cir-

cumstances involved, he is entitled to back pay as equitable restitution for the injury sustained because he was deprived of procedural due process. The Court must identify the particular constitutional right to be vindicated, examine all the facts and circumstances surrounding the deprivation of that right and determine the effect of such deprivation upon the plaintiff.

[T]he hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate his employment is solely 'to provide the person an opportunity to clear his name'. *Codd v. Velger*, 429 U.S. 624, 627–628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977).

 Dr. Giordano has now had his hearing. The Court is not at this time concerned with the result. The important thing is that he has now had an opportunity to explain, refute or otherwise reply to stigmatizing charges. This is the limit of the procedural due process to which a nontenured employee is entitled under the Constitution. Dr. Giordano, as a probationary employee, could have been terminated for any reason which was not impermissible under the Constitution. As there is no claim Dr. Giordano was discharged for exercising his First Amendment Rights or other constitutional guarantees, the allowance of back pay would be a windfall to him unless he was actually injured by the delay in the hearing in such a way that he became entitled to restitution.

 Dr. Giordano's personnel file included written material he had never seen prior to his discharge. This material contained charges that, in this Court's view, were stigmatizing. Without repeating the reasoning set forth in the May 19, 1977 opinion, the Court is convinced that Dr. Giordano was placed in a situation where he could not release the unrefuted file in order to get a position nor could he expect to find another position if he refused to release his file. His situation was made considerably less favorable because his name was on the VA "black list".

At the March 6, 1978 hearing on the back pay issue, Dr. Giordano testified to substantial and significant efforts in Sarasota, Florida both in private practice and at the educational level and around the St. Louis area. He had described his earlier efforts at other hearings. Contact was also made with the University of California, the University of Missouri, the University of Iowa and the State of Hawaii. A number of other attempts were made with no success. Dr. Giordano testified that in all instances employment was precluded because of the termination from Veteran's Administration, his unwillingness to sign a release of the full personnel files containing the unanswered stigmatizing charges and the pending litigation. Private practice was precluded because hospital privileges are essential and these cannot be obtained absent full release of records. Teaching positions were precluded because, although Dr. Giordano may have been able to obtain hospital privileges in state schools, the overwhelming majority of these locations also contain VA hospitals and the state institutions require parallel receipt of hospital privileges. Dr. Giordano has been unable to obtain any permanent position because of his improper discharge, but he has worked in a temporary capacity for a small number of hours doing emergency room work in Missouri.

 Although the Court does not believe that an award of back pay is warranted as a matter of law solely for the deprivation of a probationary employee's liberty interest, back pay may be, and is here warranted because the deprivation of that liberty interest precluded gainful employment between the initial constitutionally impermissible discharge procedure and the date the ordered hearing was held. (The sufficiency of that hearing and any further injury or damages is not before the Court at this time.)

The Court believes that Dr. Giordano is equitably entitled to an award of back pay from the date of his initial discharge on February 21, 1976 to November 11, 1977, the date when the Review Hearing in Washington, D. C. was completed, reduced by $5,651.95, the amount of interim earnings he has been able to obtain.

Counsel for plaintiff shall prepare an Order for Judgment in accordance herewith, submit it to the government for its approval and present it to the Court for signature.

IT IS SO ORDERED.