Richard A. SCARNATI, D.O., Plaintiff,

v.

Leonard WASHINGTON, Jr.; Janardan P. Sinha, M.D.; Murray Feldberg, M.D.; Saul C. Holtzman, M.D.; Harry Walters; and United States of America, Defendants.

Civ. A. No. 84–0078.

United States District Court, M.D. Pennsylvania.

Jan. 3, 1985.

Mark P. Widoff, Widoff, Reager, Selkowitz & Adler, P.C., Camp Hill, Pa., for plaintiff.

Sally A. Lied, Asst. U.S. Atty., Harrisburg, Pa., for the U.S.

## MEMORANDUM

CALDWELL, District Judge.

### I. Introduction

Before the court is the motion of defendants for summary judgment in the above-captioned matter. The motion now applies only to the United States, the sole remaining defendant pursuant to a stipulation of the parties which was approved on December 13, 1984, and provided that all other defendants be voluntarily dismissed from this case pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii).

The summary judgment motion is opposed by plaintiff, and the parties have agreed to a set of facts that constitutes the evidence in this case. The parties acknowledge that we have before us all relevant materials needed to decide the summary judgment motion. For the reasons discussed hereinafter we have concluded that defendant's motion should be granted.

### II. Background

The plaintiff, Dr. Richard A. Scarnati, initiated this action under 28 U.S.C. §§ 1331 and 1346, contending that he was denied due process in the proceedings that led to his termination as a staff psychiatrist with the Veterans Administration. At the times relevant to the present complaint (September 26, 1982, to October 7, 1983), plaintiff was considered a probationary physician and was subject to the provisions of 38 U.S.C. § 4106. Section 4106(b) of the statute specifies that the probationary period is two years in duration and that the records of probationary physicians are subject to periodic board review. Moreover, if the board concludes that the doctor is "not fully qualified and satisfactory he shall be separated from the service." *Id.*

After his appointment to the VA Medical Center in Lebanon, Pennsylvania, plaintiff, a doctor of osteopathy and a psychiatrist, began working in a satellite outpatient clinic in Harrisburg. By January of 1983, complaints from patients and other individuals were being received by VA officials about plaintiff's ability to establish affirmative relationships with patients and about his treatment methods, particularly his refusal to prescribe medications that some patients had been using with apparent success over long periods of time.

The abrupt changes made by plaintiff in the medications received by his patients stemmed from his view that the use of certain drugs was dangerous except on a short term basis. Following discussions with his superiors about the complaints, plaintiff received a special proficiency report that gave him an unsatisfactory rating. He was also notified that a three-member Professional Standards Board (PSB) would be convened to determine whether plaintiff would have his employment continued or terminated.

At the initial PSB meeting on July 12, 1983, no deliberations occurred nor was testimony heard or exhibits received. On July 19, however, twelve written exhibits were submitted and testimony was received from the plaintiff and from three of his supervisors. Plaintiff addressed the two issues the PSB was considering: the propriety of his medication procedures and his relationship with patients. At plaintiff's request another session of the PSB was held on August 4, 1983, so that he could further present his case.

On that date, at the conclusion of the proceedings, the PSB recommended plaintiff's termination and concluded that Dr. Scarnati's clinical competence was unsatisfactory "due to his inability to establish and maintain productive doctor-patient relationships and his failure to follow the instructions of his supervisors." Upon further review by a central office board of the VA, the recommendation of the PSB was approved and Dr. Scarnati was notified that he would be terminated at the close of business on October 13, 1983.

On January 18, 1984, the complaint in the present action was filed alleging that plaintiff's discharge violated his fifth amendment due process rights as well as applicable VA regulations. The principal relief sought was reinstatement with back pay

pending a hearing pursuant to constitutional requirements and VA regulations.

### III. The "Liberty Interest" Issue

Disposition of the current motion turns on the common issue characterizing similar cases where due process violations are alleged, i.e. whether a "property" or "liberty" interest in employment is involved. As numerous cases have held, absent such an interest, plaintiff cannot assert a due process claim under the constitution. *See, e.g., Orloff v. Cleland,* 708 F.2d 372 (9th Cir. 1983). The United States Supreme Court, in the landmark case of *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), concluded that an individual does not have a property interest in a governmental benefit, including employment, unless he has entitlement to the benefit. In the present case, it is undisputed that plaintiff was a probationary physician and therefore had no property interest in continued employment as a VA staff psychiatrist. Thus his due process claim is dependent upon whether his problems with the VA infringed a constitutionally protected liberty interest.

Formulating a precise definition of what constitutes a liberty interest is difficult. In *Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361 (9th Cir.1976), the court stated,

> The "liberty interest" is the interest an individual has in being free to move about, live, and practice his profession without the burden of an unjustified label of infamy. *Board of Regents v. Roth,* 408 U.S. at 572, 92 S.Ct. at 2706, 33 L.Ed.2d at 557. In the context of *Roth*-type cases, a charge which infringes one's liberty can be characterized as an accusation or label given the individual by his employer which belittles his worth and dignity as an individual and, as a consequence is likely to have severe repercussions *outside* of professional life. Liberty is not infringed by a label of incompetence, the repercussions of which primarily affect professional life, and which may well force the individual down one or more notches in the professional hierarchy.[13] The distinction is not

perfect; our utility affects our dignity and worth whether viewed from within or without. However, implicit in such a distinction is the notion that the constitutional need for procedural protection is not strong when the charge (e.g., incompetence) involves a matter which is peculiarly within the scope of employer-employee relations and when the likely results of even a false charge are reduced economic returns and diminished prestige, but not permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession. Employers, including the Veterans' Administration, have a strong interest in conserving resources and dealing expeditiously with incompetent employees.

[13] But a label which would prevent an individual from practicing his chosen profession at all may have consequences so severe that liberty would be infringed. Such a formulation raises the possibility that in some cases due process rights will turn on a definition of the scope of a particular profession. In this case, both parties appear to have assumed that the relevant profession is "physicians."

*Id.* at 366.

*Stretten,* a case heavily relied upon by defendant, bears discussion. The plaintiff, a physician who was employed as a resident in pathology at a VA hospital, was terminated prior to completing his first year of residency essentially for unsatisfactory performance of his duties. The appellate court in *Stretten* concluded that the district court had erred in finding that a liberty interest was infringed by the doctor's dismissal and found instead that the record below did not support a contention that such an interest had "in any way been infringed." *Id.* Moreover, the court observed,

> All the charges which surround his termination center around his inability to perform satisfactorily as a pathology resident, including an unwillingness or inability to deal with his coworkers in a professional manner. These are not the kind of charges which are likely to preclude Dr. Stretten from practicing medicine, and in fact there is evidence in the record that the charges may not have

precluded him from staying in his specialty of pathology. [footnote omitted]. Thus we find no infringement of liberty and hence no deprivation of due process on that account. [footnote omitted].

*Id.*

In the present case, plaintiff has argued that his situation is distinguishable from that of the physician in *Stretten* because he can show that the charges against him have interfered with his employment and will continue to hinder his finding work as a physician. The stipulations of fact filed in this matter, however, belie plaintiff's contentions. The stipulations indicate that all VA installations receive a list of *"some former employees of the VA whose employment is terminated"* (emphasis supplied). The central office of the VA must be contacted before such individuals may be hired. Dr. Scarnati has provided a lengthy list of prospective employers to whom he made application from October 13, 1983, through September 26, 1984. Whether or not plaintiff's name has been circulated to VA installations is unclear but at any rate it appears that plaintiff has not applied for employment at such facilities. Under the circumstances, we cannot conclude that plaintiff is precluded from all future positions with the VA.

In addition, although the stipulations indicate that other federal agencies may receive copies of plaintiff's personnel file if they so request, the record is unclear on whether any federal agency has made such a request. It is undisputed, however, that of the 124 prospective employers on plaintiff's list only one contacted the VA concerning his employment history. Thus, although plaintiff may feel compelled to consent to disclosure of his VA personnel folder to possible employers who request the information, such requests to date have been minimal. By his own admission, Dr. Scarnati has voluntarily disclosed the circumstances of his discharge not only to potential employers but also to the general public, largely through the news media.

■ Plaintiff's efforts to publicize his discharge are significant in the context of the form of action he has brought. In *Orloff, supra,* the United States Court of Appeals for the Ninth Circuit reversed the lower court's grant of summary judgment for defendants because of deficiencies in the record, among which were "whether the VA publicized the reasons for Orloff's discharge." 708 F.2d at 378. As the court noted,

[W]hen the government dismisses an individual for reasons that might seriously damage his standing in the community, he may be entitled to notice and a hearing. *Board of Regents v. Roth,* 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12. The accusations, however, must be publicized. *See Bollow v. Federal Reserve Bank,* 650 F.2d 1093, 1101 (9th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982). Moreover, the accuracy of the charges must be contested. *Vanelli v. Reynolds School District No. 7,* 667 F.2d 773, 777 (9th Cir.1982).

*Id.* The court in *Bollow, supra,* citing among other case, *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976), found that "[u]npublicized accusations do not infringe constitutional liberty interests because, by definition, they cannot harm 'good name, reputation, honor, or integrity.' " 650 F.2d at 1101.

■ No evidence exists in the present case that the publicity generated about plaintiff's dismissal originated with the VA. Thus, the charges against plaintiff would not have been publicized, with the possible exception of information circulated to VA installations, but for Dr. Scarnati's efforts to focus media attention on his problems with the VA. Under the circumstances we must conclude that all publicity that could negatively influence plaintiff's status in the job market was generated by plaintiff. The focus of the relevant cases, such as *Bollow, supra,* and *Orloff, supra,* is on whether adverse publicity originated with the employer. The VA in the present matter played no role in providing information to the media regarding Dr. Scarnati's discharge.

The stipulations of fact further reveal that although Dr. Scarnati has not had fulltime work as a psychiatrist since his dismissal, he worked for two months in the summer of 1984 for the Harrisburg Institute of Psychiatry. A glowing letter from his supervisor at this Institute has been submitted for our consideration. Such a reference should facilitate plaintiff's finding future employment as a psychiatrist.

Unlike the plaintiff in *Orloff*, who was charged with assigning VA doctors to perform services for a private medical corporation and with working privately in other locations during hours when he was credited with being on duty at a VA installation, Dr. Scarnati was not charged with dishonesty or immorality or other actions rising to the "moral turpitude" standard discussed in *Stretten, supra*. Rather he was terminated because he could not establish productive relationships with his patients and did not follow directions from his supervisors, particularly with regard to abrupt medication changes for his patients.

We have carefully considered the case of *Giordano v. Roudebush*, 448 F.Supp. 899 (S.D.Iowa 1977) (hereinafter *Giordano I*) relied upon by Dr. Scarnati. In *Giordano I* a liberty interest was found to have been infringed when a probationary urologist was dismissed. A major concern of the *Giordano I* court was that Dr. Giordano was deprived of a hearing with "some measure of procedural protections." *Id.* at 904. In the present case, we have concluded that a liberty interest was not infringed and that no due process hearing was required. Nevertheless, for the sake of clarification, we shall examine the due process issue and in doing so, distinguish the present matter from *Giordano I*.

## IV. Due Process Considerations

Plaintiff's due process attack focuses on the exhibits considered by the PSB. First,

Dr. Scarnati contends that he had never seen three of the twelve exhibits presented to the PSB on July 19, 1983, until he received copies of all the exhibits in October, 1983. The three exhibits in question addressed patient complaints about Dr. Scarnati with regard to abrupt medication changes and/or poor rapport with patients.[1] Plaintiff has further contended that three other exhibits were incomplete because they were complaints about him to which one of his superiors responded. Plaintiff contends that the responses, which were not submitted for consideration by the PSB, approved plaintiff's actions and thus were erroneously and prejudicially omitted.[2] The final contention regarding exhibits is that a memorandum dated December 17, 1982, to plaintiff from his direct supervisor was not submitted to the PSB. That document addressed the results of an audit of the records of fifteen out-patients, asked that Dr. Scarnati "note the deficiencies," and concluded with "I know you have corrected most of these and I feel you are doing a fine job. Keep up the good work."

■ Plaintiff, as a probationary employee, clearly was governed by the provisions of 38 U.S.C. § 4106 rather than 38 U.S.C. § 4110, which applies only to tenured employees. Two cases that have comprehensively discussed the differences between the process that is due employees pursuant to the aforementioned statutory provisions are *Kenneth v. Schmoll*, 482 F.2d 90 (10th Cir.1973) and *Giordano v. Roudebush*, 617 F.2d 511 (8th Cir.1980) (hereinafter *Giordano II*). In *Kenneth*, a case in which the appellate court reversed the district court's order that a probationary VA nurse be reinstated pending a full evidentiary hearing, the court concluded,

[T]he VA views the probationary period as being an extension of the appointment process, which provides the final test of

---

1. The first two were memoranda dated March 16 and March 17, 1983, and were written by the assistant chief of the psychiatry service, one of plaintiff's supervisors. The third, dated July 6, 1983, was from a VA team leader to the chief of the psychiatry service.

2. The exhibits consisted of letters dated January 28 and February 23, 1983, and a memorandum dated June 19, 1983. The February correspondence came from a woman with a personal care home for veterans and detailed medication changes and the results thereof for several of Dr. Scarnati's patients.

actual performance on the job and which is designed to protect the VA against the retention of individuals who are found in actual practice to be unsuited for permanent employment. In any event, there is most certainly no language in § 4106(b) which suggests to us that a probationary employee is entitled to a full-blown, trial-like hearing, with the right to counsel, right to confront adverse witnesses and cross-examine, before he be "separated from the service." On the contrary, we believe the exact opposite is indicated.

In line with the provisions of § 4106(b), the regulations promulgated by the Administrator to effectuate this particular legislative intent sets up a review board known as the Professional Standards Board, which is authorized, among other things, to conduct a so-called summary review "when summary separation from the service may be justified." Under these regulations, notice is required, which notice is to be "brief, but in sufficient detail so that the employee will clearly understand why his services are considered deficient and/or the nature of the incident involved," with the subject of the hearing permitted to thereafter appear before the Professional Standards Board and make an oral or written statement in his own behalf, though not being permitted to confront and cross-examine witnesses or be represented by counsel. *Id.* at 93–94. Although nurse Kenneth had alleged but not presented to the trial court a constitutional right to a full scale hearing, the appellate court "in the interest of bringing the matter to speedy conclusion" ordered that no hearing be held on "whether a preliminary injunction could be based on any constitutional ground." *Id.* at 95.

In *Giordano II*, the court in discussing the same statutory provisions and their separate and distinct applicability to probationary and tenured medical employees, noted that plaintiff urologist upon rehearing had received a 2–1 retention vote by the PSB convened in his case. The heart of *Giordano I*, however, in contrast to the present case, was the court's observation that plaintiff would have had no right to a constitutional due process hearing except to give him the opportunity to refute and/or explain the stigmatizing statements in his record. 448 F.Supp. at 899.

In the present case, plaintiff, unlike Dr. Giordano, appeared before the PSB twice and had ample notice of the charges being considered, as well as the opportunity to counter them. Insofar as the exhibits are concerned, we agree with defendant's position that plaintiff was not entitled to copies of all materials reviewed by the PSB. Even assuming *arguendo* that Dr. Scarnati could demonstrate a right to these exhibits, any error in failing to provide them would appear harmless. The favorable memorandum of December 17, 1982, has no relevance to the proceedings initiated later on the specific problems before the PSB. The letters of March 7 and June 23, 1983, do not contain blanket approvals of Dr. Scarnati's methods. Finally, the exhibits dated March 16, March 17, and July 6, 1983, either reiterate complaints of which plaintiff was aware through other sources or, in the case of the July memorandum, is somewhat vague so that any rebuttal would of necessity be equally general.

## V. Conclusion

In conclusion, even were a liberty interest implicated in the present case, and we have determined it was not, plaintiff was accorded more than ample opportunity to answer and refute the charges against him. Based upon the discussion above the defendant's motion for summary judgment will be granted in an accompanying order.

### ORDER

AND NOW, this 3rd day of January, 1985, IT IS ORDERED THAT:

1. Defendant's motion for summary judgment is granted.

2. The Clerk of Court shall close the file.