**Adib ZAKY, M.D., Plaintiff,**

**v.**

**UNITED STATES VETERANS ADMINISTRATION; James Woytassek; and Sun J. Guo, M.D., Defendants.**

**Civ. No. F 82–114.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Oct. 18, 1984.
On Motion for Summary Judgment
Mar. 8, 1985.

Adib Zaky, M.D., pro se.

David H. Miller, Asst. U.S. Atty., Fort Wayne, Ind., for defendants.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on defendants' Motion to Dismiss and Motion for Summary Judgment, and plaintiff's Motion for Partial Summary Judgment. For the following reasons, defendants' motion for summary judgment will be granted in part and denied in part, and plaintiff's motion for partial summary judgment will be denied.

This case arises out of plaintiff Zaky's employment as a cardiologist at the V.A. Medical Center at Fort Wayne, Indiana. Zaky was hired on February 22, 1981 pursuant to 38 U.S.C. §§ 4104 and 4106, the statutory provisions which empower the Administrator of the Veterans Administration (V.A.) with hiring authority. Under § 4106(b), Zaky was a "probationary" employee. In the course of his employment, Zaky made various criticisms of, and recommendations for changes in, procedures at the Medical Center, as well as requests that certain accusations against him be investigated or ended. For purposes of resolving these motions, the substance of these recommendations and "complaints" is not important. It is important to note, however, that at least some of these complaints were directed at actions taken by Dr. V.N. Venkatachala, the Chief of Medical Service at the Medical Center.

A series of official charges concerning the plaintiff's work at the Center were filed on four occasions: December 1, 1981; March 15, 1982; April 9, 1982; and July 13, 1982. Zaky responded to each of these sets of charges by filing memoranda or by attempting to initiate some kind of grievance proceeding. On March 15, 1982, Zaky was officially reprimanded by a Professional Standards Board, of which Dr. Venkatachala was one of the three members; and on September 23, 1982 was issued a Notice of

Separation after a Professional Standards Board had been convened on July 14, 1982.

Plaintiff's amended complaint alleges several causes of action: (1) his termination based on the recommendations of the July 14, 1982 Board constitutes an unlawful retaliation against the plaintiff for exercising his rights under the first amendment, the regulations under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq., and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq.; (2) a violation of his "liberty interest" in his professional reputation protected by the fifth amendment, which required that plaintiff be given a hearing to clear his name; (3) the termination violated the minimum guarantees of fairness under 38 U.S.C. § 4106(b); and (4) the decision to terminate was arbitrary and capricious, and as such, subject to reversal by this court pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

Defendants have responded by filing first a motion to dismiss and then a motion for summary judgment on the entire complaint. For purposes of this order, the motion to dismiss is viewed as merged into the motion for summary judgment. The thrust of the defendants' position is that Dr. Zaky received all the procedural protection that he was entitled to receive under § 4106 and the fifth amendment, and that the statements made by Dr. Zaky were not "matters of public concern" so as to justify first amendment protection. Plaintiff has countered with opposing memoranda and his own motion for partial summary judgment on the fifth amendment issue.

## Discussion

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment serves as a vehicle with which the court "can determine whether further exploration of the facts is necessary." Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir.1975).

In making this determination, the court must keep in mind that the entry of summary judgment terminates the litigation, or an aspect thereof, and must draw all inferences from the established or asserted facts in favor of the non-moving party. Peoples Outfitting Co. v. General Electric Credit Corp., 549 F.2d 42 (7th Cir.1977). A party may not rest on the mere allegations of his pleadings or the bare contentions that an issue of fact exists. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, — U.S. ——, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). See Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). See also Atchison, Topeka & Santa Fe Railway v. United Transportation Union, 734 F.2d 317 (7th Cir.1984); Korf v. Ball State University, 726 F.2d 1222 (7th Cir.1984). See generally C. Wright, Law of Federal Courts, § 99 (4th ed. 1983); 6 Moore's Federal Practice, § 56.15 (2d ed. 1984).

Thus, the moving party must demonstrate the absence of a genuine issue of material fact. The court views all evidence submitted in favor of the non-moving party. Even if there are some disputed facts, where the undisputed facts are the material facts involved and those facts show one party is entitled to judgment as a matter of law, summary judgment is appropriate. Egger v. Phillips, 710 F.2d 292, 296–97 (7th Cir.1983); Collins v. American Optometric Ass'n, 693 F.2d 636, 639 (7th Cir.1982). Further, if the court resolves all factual disputes in favor of the non-moving party and still finds summary judgment in favor of the moving party is correct as a matter of law, then the moving party is entitled to summary judgment in his favor. Egger, 710 F.2d at 297. See also Bishop v. Wood, 426 U.S. 341, 348, 348 n. 11, 96 S.Ct. 2074, 2079, 2079 n. 11, 48 L.Ed.2d 684 (1976).

This court now turns to the three issues raised by the motions for summary judgment.[1]

*38 U.S.C. § 4106*

At the time of his suspension and termination, plaintiff Zaky was an appointed physician at the Medical Center under the terms of 38 U.S.C. § 4106. Subsection (b) of that section provides that

Such appointments as described in subsection (a) of this section shall be for a probationary period of two years and the record of each person serving under such appointment in the Medical, Dental, and Nursing services shall be reviewed from time to time by a board, appointed in accordance with the regulations of the Administrator, and if said board shall find him not fully qualified and satisfactory he shall be separated from the service.

The review mandated by this section is not extensive. As a probationary employee, Dr. Zaky has "no legitimate claim of entitlement to nor reasonable expectation of continued employment creating a property interest which would require a due process hearing." *Giordano v. Roudebush*, 448 F.Supp. 899, 904 (S.D.Iowa 1977), *aff'd*, 617 F.2d 511 (8th Cir.1980) (hereinafter *"Giordano I"*). He "may be dismissed in a summary review by the board," *Giordano v. Roudebush*, 617 F.2d 511, 517 (8th Cir.1980) (hereinafter *"Giordano II"*). During the review of his employment record, he is entitled to notice of why his work is considered deficient and an opportunity to make an oral or written statement on his behalf, *Giordano II*, 617 F.2d at 511; *Kenneth v. Schmoll*, 482 F.2d 90, 94 (10th Cir.1973), but he is not entitled to be represented by counsel or to confront and cross-examine witnesses. *Giordano II*; *Schmoll*; *Suess v. Pugh*, 245 F.Supp. 661, 665 (N.D.W.V.1965). Finally, limited review by a professional standards board of a probationary physician's professional competency is the only procedure available

to him; § 4106 does not entitle him to any review of the board's disciplinary action. *Giordano II.*

According to the terms of § 4106(b), the professional standards board which reviews the probationary physician's record must be "appointed in accordance with regulations of the Administrator." According to the Veterans Administration regulations governing appointment of review boards (MP–5, part 2, Ch. 4, § 4(a), July 1, 1974),

Each employee who is subject to completion of the probationary requirements of 38 U.S.C. 4106(b) shall have his record reviewed in a fair and impartial manner by a professional standards board during his probationary period to determine whether his employment in the Department of Medicine and Surgery shall be continued. These reviews shall be based on the need therefor to insure that every reasonable step is taken to ascertain whether employees are fully qualified and satisfactory.

These regulations also require that a board notify a probationary physician in writing that evidence that the physician is not fully qualified is in his record. The notice shall inform the physician of the reasons for the review of his record, that he may appear personally or submit a written statement in his behalf, and that he is not entitled to legal representation during the conduct of the review. Section 4(c). Finally, the regulations provide that "findings and recommendations of the professional standards board will be based on a review of the employee's record and evidence presented during the conduct of the review." Section 4(d).

The defendants have moved for summary judgment, claiming that Dr. Zaky received all that he was entitled to under the statute. However, the statute indicates that the regulations of the Administrator,

---

**1.** The fourth claim of the amended complaint, that the decision to terminate was arbitrary and capricious and therefore subject to reversal by this court, has not been briefed by the parties and is not properly before the court at this time. The court notes, however, that the premise of this claim is that § 4106 was violated, for if § 4106 was followed, then the decision of the Board was proper and hence not arbitrary and capricious. It is at present unclear to the court that this fourth claim asserts a cause of action independent of the § 4106 claim.

at least with respect to the appointment of the professional standards board, must be followed. Those regulations require that the review be conducted in a "fair and impartial manner." The thrust of Dr. Zaky's complaint is the board which suspended him was not impartial; at least two of the members of the board (Dr. Venkatachala and Dr. Hann) were the same doctors whom Dr. Zaky had criticized and who, according to Dr. Zaky, were attempting to have him removed from the staff. The impartiality of the board, necessary to fulfilling all of the requirements of § 4106(b), is a material fact which is disputed by Dr. Zaky's assertion of bias. His affidavit, attached to the motion for partial summary judgment, recites instances of Dr. Venkatachala saying he was going to "find" Dr. Zaky's "faults," lowering Dr. Zaky's performance ratings, and encouraging criticism of Dr. Zaky. With such a background of apparent conflict, Dr. Venkatachala's presence on the review board raises questions about the board's impartiality and adherence to V.A. regulations, for "[p]ersons in a position to prejudice the action of the board may not serve as members of the board conducting the review." DM & S Supp., MP–5, Part II, Ch. 4, Change 1, ¶ 4.06(c)(9) (March 14, 1966). In the somewhat analogous situation of prison disciplinary boards, the Seventh Circuit has said that "the requirement of impartiality mandates the disqualification of an official who is directly involved in the incident or is otherwise substantially involved in the incident...." *Merritt v. De Los Santos*, 721 F.2d 598, 601 (7th Cir.1983). Thus, a factual issue as to the board's impartiality exists. Resolving this issue against the moving party, this court finds a disputed issue of material fact, and thus will not grant defendants' motion for summary judgment on plaintiff's § 4106 claim.

*Fifth Amendment Liberty Interests*

Plaintiff has asserted a claim based upon the fifth amendment due process requirements. The core of the claim is that plaintiff has a liberty interest in his professional reputation which was impugned without due process of law by the actions of the review board. Dr. Zaky asserts that this denial of due process gives him a cause of action under the fifth amendment, and seeks summary judgment on this claim. The defendants oppose this motion by their cross-motion for summary judgment.

■ In order to have a valid due process claim, the plaintiff must establish two things: that he has a liberty or property interest to be protected; and that his interest was denied without the proper process. Plaintiff's arguments have been directed almost exclusively to the first element, while ignoring the second. As a result, plaintiff fails to establish a cause of action based on the fifth amendment.

■ This court agrees with Dr. Zaky that a liberty interest is involved in a situation where the accusations against a probationary physician are potentially available to future employers. *See Giordano I*, 448 F.Supp. at 906. However, this alone does not establish a claim. As plaintiff readily concedes, the question then becomes "what process is due?" *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972).

■ Plaintiff attempts to argue, by analogy to non-tenured faculty members, that due process requires that a fair and impartial board be involved in the process, thus making the impartiality of Dr. Zaky's review board a material fact. However, plaintiff looks to the wrong type of process as the cure for the damage to his liberty interest. Damage to Dr. Zaky's professional reputation occurs when a future employer looks to his records at the Medical Center and sees a disparaging comment or accusation about his professional competency. The fact that an impartial board made those comments, or that the accusations were made before an impartial board, does nothing to lessen the impact on the future employer's perception of Dr. Zaky. In short, a hearing before an impartial board does not protect Dr. Zaky's liberty interest in his professional reputation. Rather, meaningful process requires some way for Dr. Zaky to rebut the charges so

as to show a future employer that the comments and accusations are incorrect. The process which would protect Dr. Zaky's reputation is the opportunity to make his side of the story part of his permanent record. This is precisely what *Giordano I*, which the plaintiff relies on heavily to prove the first part of his fifth amendment claim, holds when it states:

> I am persuaded that Dr. Giordano should be afforded the opportunity to make his position a matter of record in an effort to abate the effect upon his liberty interest of the stigmatizing information.... The court has held that he is entitled to an opportunity to refute or explain those statements so that the review board will have a fair record upon which to make a decision and his opportunities for future employment will not be unconstitutionally limited.

448 F.Supp. at 906. In short, the fifth amendment process due a probationary physician confronted with stigmatizing statements in his personnel file is the opportunity to respond to those charges orally or in writing before the reviewing board.

■ Dr. Zaky had an adequate opportunity to respond to the charges against him. The "opposition to defendants' motion for summary judgment" concedes that "plaintiff was afforded an opportunity to submit a written request in response to the charges" before the board. That written statement, denominated as Defendants' Exhibit 4 and attached to defendants' motion in opposition to the plaintiff's motion for partial summary judgment, is a detailed denial of the charges and an explanation for plaintiff's actions which form the basis of the charges against him. According to the defendants, that statement was read to the board and left with them during the July 14, 1982 hearing. The inclusion of that statement in the record guarantees Dr. Zaky that any future employer will have both sides of the story so that, in the words of the *Giordano I* court, "his opportunities for future employment will not .be unconstitutionally limited." 448 F.Supp. at 906. Dr. Zaky's fifth amendment rights therefore were not violated.

It is important to emphasize that this holding is not inconsistent with the ruling concerning the claim under § 4106(b). Plaintiff is attempting to assert a claim under the fifth amendment, but is dragging in concepts from the provisions of § 4106 (such as the asserted violation of V.A. regulations), and confusing the two causes of action. The fifth amendment guarantees process sufficient to protect the implicated interest; here, the opportunity to present his side of the story protects Dr. Zaky's liberty interest in his professional reputation. Congress, in creating the probationary physician position in 38 U.S.C. § 4106, decided to give the probationary doctor additional rights under that section. One such right is the right to a fair and impartial manner of review. However, that statutorily created cause of action does not expand the ambit of the fifth amendment guarantees. This court is convinced that the requirements of the fifth amendment were satisfied. The defendants are therefore entitled to summary judgment as a matter of law. The defendants' motion for summary judgment will therefore be granted as to the fifth amendment claim, and the plaintiff's motion for partial summary judgment will be denied.

*First Amendment Concerns*

Plaintiff has asserted a third claim based upon freedom of speech principles. Dr. Zaky contends that he was terminated from his job at the Medical Center in retaliation "for his exercise of rights protected by the first amendment of the United States Constitution...." Amended Complaint at 10. Dr. Zaky's protected speech activity consisted of his criticism of fellow doctors' procedures and recommendations for changes in Medical Center policy and procedures. This speech is asserted to be "protected activity" which was "the substantial and motivating factor leading to defendants' suspension and termination of plaintiff's employment." *Id.* at 10–11.

Defendants have based their argument for summary judgment on the claim that Dr. Zaky's speech was not a protected ac-

tivity under the first amendment because it was simply directed to internal Medical Center concerns and not to any matter of public concern. Plaintiff disagrees with that assessment, arguing that because he sought to improve the quality of care at the Medical Center and to expose wrongdoing and breaches of the public trust by the V.A. administrators, the speech is protected activity.

■ Among the protections the Constitution provides to all public employees is the right not to be fired for reasons that infringe on first amendment rights. *See Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1975). As one court has stated, "even though public employees may be fired for many reasons—and probationary employees often for no reason at all—such employees may not be discharged merely for speaking out." *Tygrett v. Barry*, 627 F.2d 1279, 1282 (D.C.Cir.1980). However, not all speech is protected by the first amendment. It is only when the speech is directed to a "matter of legitimate public concern" that first amendment protection is available, *see Pickering v. Board of Education*, 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968), and that protection arises even when the public employee communicates his views privately rather than publicly. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). If, however, the speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary ... to scrutinize the reason for ... discharge." *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). The inquiry into whether a statement is protected speech on a matter of public concern is a question of law, *id.* 103 S.Ct. at 1690 n. 7, and thus appropriate for determination on summary judgment.

The courts have not extensively analyzed the question of what constitutes a "matter of legitimate public concern." The *Connick* Court did state that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency in reaction to the employee's behavior." *Id.* at 1690. The Court later referred to a desire to "bring to light actual or potential wrongdoing or breach of the public trust" as a factor in judging whether the speech was about a matter of public concern. *Id.* at 1690–91. In *Pickering*, the Court spoke of "issues then currently the subject of public attention," 391 U.S. at 572, 88 S.Ct. at 1731. These definitional factors do not help to clear up the confusion inherent in such a nebulous concept.

■ To assist in defining a "matter of public concern," the *Connick* Court gives two procedural guidelines. First, "whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." 103 S.Ct. at 1690. Second, speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." *Id.* at 1691 n. 8. Thus, while the subject of a statement might interest the public, that does not automatically make it a matter of public concern. The intent and context of a statement is just as important as its content.

■ Plaintiff claims that all of his statements are protected because they were made either to improve the quality of care or to bring to light wrongdoing and breaches of the public trust. However, that characterization is too sweeping. Some statements, such as plaintiff's recommendations for different procedures in the pacemaker program or complaints about the improper use of treadmill tests by certain doctors, are arguably statements designed to improve the quality of patient care in that they seek to improve or change certain conditions at the Medical Center.

However, most of the plaintiff's statements brought to the attention of this court were simply statements made in defense of the numerous complaints lodged against the plaintiff. Those statements appear to have been made in the context of an employee protecting his job, a matter of personal interest. These are precisely the kinds of statements which the *Connick* Court held are not on matters of public concern, and thus not entitled to protection in a federal court.

Nor can this court accept that the statements made in defense of plaintiff's action were made to expose wrongdoing and breaches of the public trust. Dr. Zaky's various statements can be classified as statements made in the midst of an internal office dispute about policy, patient treatment procedures, and interaction between Medical Center staff members. He was attempting to justify his actions in the face of charges and possible dismissal, not "blowing the whistle" on Medical Center practices so as to expose wrongdoing at the Center. The context and content of the statements militate against any other conclusion.

To the extent that Dr. Zaky's statements are viewed as advocating the improvement in the quality of care at the Medical Center, they nevertheless do not address matters of public concern. While it is true that the general public may be interested in the quality of care at the Medical Center, that does not convert these statements into speech about matters of public concern. The *Connick* Court mandates a consideration of the context of the statement. Here, Dr. Zaky's statements were made in the course of internal hospital business involving the determination of which procedures would be used at the Medical Center. The impact on the public through an improvement of the quality of care, though potentially important, is derivative in the sense that it would only come about after Dr. Zaky made the recommendation, the Medical Center directors decided it was a good procedure to implement, and was in fact implemented. In short, Dr. Zaky's statements were made as part of an internal process of policy determination within the Medical Center, and are not a matter of public concern for precisely that reason, even though similar statements in a different context may have appealed to the public's general interest. As the *Connick* Court concluded, "while as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the first amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." 103 S.Ct. at 1691.

Because these statements are not matters of public concern, the court need proceed no farther with a first amendment analysis. The court does note, however, that the amended complaint combines the first amendment basis of the retaliatory discharge claim with the Age Discrimination Act and Title VII. However, the plaintiff has offered no argument on these related bases for the claim, and the court cannot conceive of a way that either of these statutes applies to plaintiff's case. The Age Discrimination Act, 29 U.S.C. § 621, *et seq.*, requires a showing of discrimination based on age. *See* § 633a. Nothing in this case indicates such discrimination existed. Further, plaintiff could not commence an action based on the statute unless he first filed a notice of intent to sue with the Civil Service Commission within one hundred eighty (180) days of the alleged unlawful practice. Section 633a(d). Nothing indicates compliance with these statutory provisions, and thus an Age Discrimination Act claim fails. Likewise, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, bans discrimination on the basis of race, color, religion, sex or national origin. The only allegation that comes close to any of these prohibited criteria is Dr. Zaky's unsubstantiated claim that Dr. Venkatachala treated physicians of Asian origin "far more favorably than the non-Asian physicians—e.g., he never subjected them to criticism in public and was much more tolerant of their mistakes." Zaky affidavit, ¶ 8. This statement, of dubious weight to begin with, does not support the Title VII claim

of the complaint, which asserts that the termination occurred as a result of statements made by Dr. Zaky. Plaintiff has failed to allege that the discrimination occurred in the decision to terminate. The fact that plaintiff has only argued the first amendment aspect of this issue is a further indication that it is the reaction to plaintiff's speech, and not his national origin, which is the wrongful act of the defendants. Therefore, no Title VII claim exists here.

Finding that there is no genuine issue of material fact, this court will grant the defendants' motion for summary judgment on the first amendment claim.

### Conclusion

For the foregoing reasons, this court hereby GRANTS defendants' motion for summary judgment as to the fifth and first amendment claims, but DENIES it as to the 38 U.S.C. § 4106(b) claim. Defendants' motion to dismiss is considered MERGED into the defendants' motion for summary judgment. Plaintiff's motion for partial summary judgment on the fifth amendment claim is hereby DENIED. A status conference in this case shall be held at 2:15 P.M. on the 26 day of October, 1984.

### ON MOTION FOR SUMMARY JUDGMENT

This matter is before the court on defendants' Motion for Summary Judgment filed November 23, 1984. In effect, this motion requests a reconsideration of the court's partial denial of the defendants' original motion for summary judgment on the basis of a clarification of the pertinent facts. For the following reasons, the motion will be granted.

This case arises out of plaintiff Zaky's employment as a cardiologist at the V.A. Medical Center at Fort Wayne, Indiana. Zaky was hired on February 22, 1981 pursuant to 38 U.S.C. §§ 4104 and 4106. Under § 4106(b), Zaky was a probationary employee of the Veteran's Administration (V.A.). He was separated from the V.A. in September, 1982 after a series of review boards recommended his separation. Zaky's amended complaint alleged violations of his first and fifth amendment rights, as well as violations of the minimum guarantees of fairness set forth in the V.A. regulations promulgated under § 4106(b).

On October 18, 1984, this court granted defendants' motion for summary judgment as to the first and fifth amendment claims, but denied the summary judgment motion as to the § 4106 claim because the court found an issue of material fact existed concerning the Professional Standard Boards (PSB) which reviewed Zaky's employment record. Specifically, the court found that the presence of Dr. V.N. Venkatachala, the Chief of Medical Service at the Medical Center, on one of the PSBs may have prevented the Board from operating in a "fair and impartial manner" during the review process because of personal and professional problems which were alleged to exist between Dr. Zaky and Dr. Venkatachala.

The defendants have now moved for a reconsideration of the court's § 4106 analysis, arguing that the board which actually made the decision to separate Dr. Zaky from the V.A. was not biased because its members were not those staff members which Dr. Zaky believed had a vendetta or were biased against him. The defendants claim that the fairness requirements of § 4106 were met in this case despite Dr. Venkatachala's (and others') presence on certain review boards, so that summary judgment on the § 4106 claim is justified as well.

Dr. Zaky, who is now proceeding *pro se*, has responded by arguing that the prescribed procedures of review were not followed because (1) not all of the procedural requirements of § 4106 were followed; and (2) the review procedure requires two PSB reviews, and the requirements of fairness and impartiality found in the V.A. regulations applies to all review procedures, so that (by implication) the presence of Dr. Venkatachala or Dr. Haan on any PSB would violate the fairness requirements of § 4106.

## Discussion

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment serves as a vehicle with which the court "can determine whether further exploration of the facts is necessary." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975).

In making this determination, the court must keep in mind that the entry of summary judgment terminates the litigation, or an aspect thereof, and must draw all inferences from the established or asserted facts in favor of the non-moving party. *Peoples Outfitting Co. v. General Electric Credit Corp.*, 549 F.2d 42 (7th Cir.1977). The non-moving party's reasonable allegations are to be accepted as true for purposes of summary judgment. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1218–19 (7th Cir.1984). A party may not rest on the mere allegations of the pleadings or the bare contention that an issue of fact exists. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See also Atchison, Topeka & Santa Fe Railway Co. v. United Transportation Union*, 734 F.2d 317 (7th Cir.1984); *Korf v. Ball State University*, 726 F.2d 1222 (7th Cir.1984). *See generally* C. Wright, *Law of Federal Courts*, § 99 (4th ed. 1983); 6 *Moore's Federal Practice*, § 56.15 (2d ed. 1984).

Thus, the moving party must demonstrate the absence of a genuine issue of material fact. The court views all evidence submitted in favor of the non-moving party. Even if there are some disputed facts, where the undisputed facts are the material facts involved and those facts show one party is entitled to judgment as a matter of law, summary judgment is appropriate. *Egger v. Phillips*, 710 F.2d 292, 296–97 (7th Cir.1983); *Collins v. American Optometric Ass'n*, 693 F.2d 636, 639 (7th Cir.1982). Further, if the court resolves all factual disputes in favor of the non-moving party and still finds summary judgment in favor of the moving party is correct as a matter of law, then the moving party is entitled to summary judgment in his favor. *Egger*, 710 F.2d at 297. *See also Bishop v. Wood*, 426 U.S. 341, 348, 348 n. 11, 96 S.Ct. 2074, 2079, 2079 n. 11, 48 L.Ed.2d 684 (1976).

The court begins by examining the regulatory framework within which a probationary V.A. employee is reviewed and "separated" from employment. Those regulations are set out in MP–5, Part II, chapter 4 (1974) ("MP–5") and DM & S Supplement, MP–5, Part II, chapter 4 (1964) ("Supplement"), which are attached as Appendix A to this order.

According to Supplement § 4.05, a probationary employee can be subject to three different kinds of service review: (1) supervisory review; (2) periodic review; and (3) summary review. Supervisory review is accomplished by a probationary employee's supervisor observing and evaluating the employee's performance. If inadequacies are observed, a "counseling program" should be used to discuss the employee's strong and weak points. According to § 4.05(b)(2),

> If, after subsequent counseling, the employee's adjustment and performance is not satisfactory, the service chief will recommend to the Chief of Staff that a review of the employee's services be made by a Professional Standards Board. This will be accomplished by memorandum setting forth the specific deficiencies of the employee or the manner in which he has failed to properly adjust to his assignment, as well as a summary of the efforts of the supervisor to assist the employee....

Section 4.05(c)(1) establishes that a probationary employee is entitled to a minimum of one periodic review during the probationary period. This periodic review

is to be made by the chief of service and a PSB. Each review originates with the chief of service, and a PSB is not required to make a review unless the Chief of Staff, upon recommendation of the chief of service, requests a PSB review.

A summary review is conducted by a PSB and is limited to situations where summary separation from the service may be justified. § 4.05(a)(3). A field station head or Chief of Staff "will" authorize a PSB to conduct an immediate review "when circumstances may justify consideration of summary separations from the service...." § 4.05(d).

Thus, there are three routes to PSB summary review of a probationary employee's employment status: (1) a service chief may, as part of supervisory review, recommend to the Chief of Staff that a PSB review be conducted, and the Chief of Staff authorizes it; (2) the Chief of Staff may, as part of a periodic review, request a PSB summary review directly, or request a PSB periodic review, which could become a summary review; and (3) the Chief of Staff may request a PSB summary review "when circumstances justify" consideration of separation, apparently whether or not those circumstances arise or become known in a supervisory or periodic review.

The rules governing PSB procedure are governed by the overarching principle of MP–5, § 4 that each probationary employee "shall have his record reviewed in a fair and impartial manner by a Professional Standards Board during his probationary period to determine whether his employment in the Department of Medicine and Surgery shall be continued." The PSB must review "the employee's record and evidence presented during conduct of the review," MP–5, § 4(d). If the PSB finds serious deficiencies in its review, the PSB is required to notify the employee in writing of the time and date of the review, as well as a statement of the reasons why his service is considered deficient, a statement that the employee may appear in person or submit a written statement, and notification that he is not entitled to legal representation. Supplement, § 4.06(b); MP–5, § 4(c). After a summary review is completed, the PSB issues its findings and recommendations in writing.

Once a PSB has made its findings, "approving authority for Professional Standards Boards is the Chief Medical Director or his designee." MP–5, § 4(e). Under the procedural rules for PSB review,

> for actions requiring approval of the Chief Medical Director, the Chairman, Special Boards, will authorize the appropriate Professional Standards Board in Central Office to review the case.... The board may make its recommendation to the Chief Medical Director on the basis of the record, or it may call the employee or other persons for additional information prior to making the final recommendation to the Chief Medical Director.

Supplement, § 4.06(g). This section effectively creates two additional layers of review in the regulatory review framework by requiring that a PSB in the V.A.'s Central Office review the case and make a recommendation to the Chief Medical Director, who then can review the case and either grant or deny final approval to the findings of the summary review PSB.

An examination of the undisputed documentary facts germane to Dr. Zaky's review reveals the following chronology. On December 18, 1981, the Chief of Medical Services, Dr. Venkatachala, prepared a proficiency rating of Dr. Zaky. The ratings ranged from satisfactory to low satisfactory. Defendants' Exhibit 2, Document 24.

On March 15, 1982, a PSB composed of Dr. Haan, Chief of Staff, Dr. Venkatachala, Dr. Sun J. Guo, Chief of Surgical Service, and Patrick McKinney of the Personnel Service, conducted Dr. Zaky's first year periodic review. The Board "felt there was sufficient evidence [Dr. Zaky's] performance has been less than satisfactory," and recommended that a Summary Review Board be conducted to determine if Dr. Zaky should continue his V.A. employment. Defendants' Exhibit 2, Document 30.

On April 9, 1982, Dr. Guo, as Chairman of PSBs at the Medical Center, wrote a letter to Dr. Zaky indicating the recommendations of the March 15, 1982 periodic review PSB. It listed the deficiencies cited by the March 15, 1982 PSB, and notified Dr. Zaky of a summary review PSB to be held on April 15, 1982, as well as giving all elements of written notice as required by Supplement, § 4.06(b). On April 14, 1982 Dr. Guo informed Dr. Zaky that the April 15, 1982 PSB was postponed for · two months.

On June 12, 1982, Dr. Haan exercised his prerogative as Chief of Staff and altered the December 18, 1981 proficiency rating by lowering two evaluations, citing deteriorating staff relations and other problems. Defendants' Exhibit 2, Document 24.

On June 18, 1982, Dr. Guo informed Dr. Zaky that the summary review PSB would meet on July 14, 1982, upon the recommendation of a PSB held June 17, 1982. It listed new charges not originally listed in the April 9, 1982 written notice, and contained all § 4.06(b) notices.

On July 14, 1982, the summary review PSB, composed of Dr. Guo, Dr. L.G. Palileo, Chief of Laboratory Services, and Dr. Dorothy Weiner, Chief of Radiology Services, met and found that all eight deficiencies listed in the June 18, 1982 notice letter were sustained by the evidence. The document which sets forth the Board's decision includes a five-page analysis of the charges. The PSB recommended that Dr. Zaky be separated. Defendants' Exhibit 6. On July 19, 1982, Chief of Staff Dr. Haan issued a memorandum to the Medical Center Director agreeing with the summary review PSB's recommendation of separation, Defendants' Exhibit 6, and on July 20, 1982, James A. Woytassek, the Medical Center Director, wrote a letter to the Regional Director of the V.A.'s Central Office, transferring the file for Central Office approval of the summary review PSB's recommendation of separation. Defendants' Exhibit 7.

On August 25, 1982, the Medical Center Director suspended Dr. Zaky pursuant to Supplement, § 4.05(d) for insubordination.

Once Dr. Zaky's file was sent to the Central Office, the documentary evidence does not indicate whether the Central Office PSB met, but on September 16, 1982, the Chief Medical Director issued a teletype transmission to the Fort Wayne Medical Center approving the recommendation that Dr. Zaky be separated. Defendants' Exhibit 9.

On the basis of this documentary evidence, the court finds that the V.A. complied with the regulatory requirements for review of a probationary employee. Dr. Zaky argues that the V.A. failed to meet the requirements in two respects: (1) the process was not fair and impartial, and (2) certain procedures were not followed. The court considers this second argument first.

*Procedural Violations*

Dr. Zaky claims several procedural improprieties in the review process: (1) the recommendation of the March 15, 1982 PSB that a "summary review board be conducted" was improper; (2) the summary suspension on August 25, 1982 was not submitted to board review; (3) defendants failed to notify Dr. Zaky of all of the serious charges in the Proficiency Report and the minutes of the March 15, 1982 PSB meeting; (4) the charges in the June 18, 1982 notice letter were vague, frivolous and arbitrary; and (5) the July 14, 1982 summary review PSB failed to review Dr. Zaky's record.

Dr. Zaky's first allegation—that the March 15, 1982 PSB's recommendation that a "summary review board be conducted" was improper—has no merit in light of the procedural regulations discussed above. The minutes of the March 15, 1982 PSB meeting indicate that it was conducting Dr. Zaky's periodic review after one year of employment. Defendants' Exhibit 2, Document 30. Under Supplement, § 4.05(c), a PSB may conduct a periodic review. The recommendation of a summary review was not improper as well. While Supplement,

§ 4.05(d) only provides that a field station head or Chief of Staff may authorize a summary review PSB, it is clear that a PSB and the Chief of Staff serve identical roles in a periodic review, so that if a periodic review discovers the need for summary review, the recommendation of summary review by a periodic review PSB would be the same as a Chief of Staff's recommendation. Further, the Chief of Staff, Dr. Haan, was a member of the March 15, 1982 PSB which "unanimously" recommended the summary review, so that the Chief of Staff did authorize a summary review PSB in the context of the March 15, 1982 PSB's recommendations.

■ The second procedural violation asserted is that the August 25, 1982 summary suspension by Medical Center Director James Woytassek was not subject to board review. However, Supplement, § 4.05(d) provides that "if the situation is sufficiently grave, the field station head upon the recommendation of the Chief of Staff, may suspend the employee or place him on annual leave (depending upon the nature of the offense), pending board review and final decision. However, a period of suspension may not exceed 30 calendar days without prior approval of the Chief Medical Director." Here, the suspension was made on August 25, 1982, and could not exceed thirty days. While the regulation states that the suspension must be "pending board review," the final decision of the Chief Medical Director on the July 14, 1982 summary review PSB recommendation of separation was handed down before the thirty days of suspension were up. Thus, the fact that the suspension was not reviewed by a PSB is not a violation of the regulations because the Medical Center Director has power to suspend for thirty days and Dr. Zaky's separation occurred before the thirty days had expired.

■ The third procedural allegation concerns failures to notify Dr. Zaky of the charges in the Proficiency Report and the minutes of the March 15, 1982 PSB meeting. The court notes that first, a probationary employee does not have a right to notice of charges in a proficiency report or the charges considered by a periodic review PSB except in limited circumstances. The only mention of a right to a proficiency report is in Supplement, § 4.05(b)(2), which states that a special proficiency report must be prepared for a probationary employee prior to his appearance before a PSB which has been convened at the request of the Chief of Staff after a supervisory review. Such was not the situation in this case. Nor is a probationary employee entitled to notice of the charges considered by a periodic review PSB unless and until the PSB determines that there are serious deficiencies. That notice was given to Dr. Zaky in the letters of April 9, 1982 and June 18, 1982 from Dr. Guo. Therefore, Dr. Zaky was not deprived of any notice to which he was entitled.

■ The fourth allegation is that the June 18, 1982 letter giving notice of the charges to be considered at the July 14, 1982 summary review PSB were "vague, frivolous and arbitrary." The court finds that all eight charges listed in the June 18, 1982 letter specified both the date of the alleged deficient action by Dr. Zaky and a description of the specific acts which Dr. Zaky did. Thus, the allegations were not vague. The summary review PSB found on the basis of interviews of personnel and Dr. Zaky's statement to the PSB that all eight allegations were "sustained by the evidence," thus suggesting that they were neither frivolous nor arbitrary. Thus, Dr. Zaky's allegation here fails as well.

■ The final procedural contention is that the July 14, 1982 summary review PSB did not review Dr. Zaky's record. The court finds that this allegation is false. The PSB's written findings state that the Board extensively questioned a total of eleven witnesses, and thoroughly reviewed the materials provided the Board by the Chief of Staff and the Chief of Medical Service. Donald Nolan, Chief of Personnel Service, testified that the documents which comprised Defendants' Exhibits 2–10 were used by the local PSB and the V.A. Central Office in considering Dr. Zaky's separation.

An examination of those documents reveals that they are a complete set of relevant records about Dr. Zaky's tenure. Furthermore, Dr. Zaky submitted two written statements to the summary review PSB in which he defended his actions and responded to all of the allegations made against him. Defendants' Exhibit 5. The PSB specifically stated that it carefully reviewed these written statements. Defendants' Exhibit 7. The court therefore finds that all relevant aspects of Dr. Zaky's record were considered by the July 14, 1982 PSB.

### Fairness/Impartiality Issues

Dr. Zaky raises several arguments to suggest that the PSB reviews of him were not "fair and impartial" as required by MP–5, § 4(a), and Supplement, § 4.06(c)(9): (1) the presence of Dr. Venkatachala and Dr. Haan on the March 15, 1982 periodic review PSB violated the regulations; (2) the delay of the summary review from April 15, 1982 to July 14, 1982 undermined the fairness of the review process; (3) the June 17, 1982 PSB was of questionable impartiality; and (4) the July 14, 1982 summary review PSB was not impartial because of Dr. Haan's prejudice against Dr. Zaky. The court examines each of these claims in turn.

Dr. Zaky argues that the presence of Drs. Venkatachala and Haan on the March 15, 1982 periodic review PSB undermined the fairness of the entire review process because of the alleged bias and prejudice both doctors felt toward the plaintiff. This court, in its October 18, 1984 order found that a material issue of fact existed as to the impartiality of a board on which either Dr. Venkatachala or Dr. Haan sat. The real issue is whether the possible impartiality of one PSB can undermine the entire review process. Given the extensive structure of the review process, the court concludes that the questionable impartiality of a periodic review PSB does not undermine the summary review process.

It is important to keep in mind the three tiers of review for probationary employees. These tiers are related in the sense that supervisory or periodic review can result in summary review; however, each tier is procedurally independent of the other. The fact that a supervisory or periodic review discovers deficiencies in an employee's performance does not bind the summary review PSB in any way, for it must follow the rules of procedure (Supplement, § 4.06) for PSBs and make its own independent finding that the alleged deficiencies are sustained by the evidence presented to the Board. Thus, a lack of impartiality on the part of a periodic review board would not affect the summary review PSB because the latter must independently find the deficiencies to exist.[1]

A second insulating feature of the review process is the number of reviews needed before an employee can be separated from the V.A. As was noted earlier, the regulations provide that a summary review PSB's recommendations must be approved by the Chief Medical Director. MP–5, § 4(e). That approval will not be given until a PSB in the V.A.'s Central Office reviews the case and makes a recommendation to the Chief Medical Director. Thus, there are at least three built-in reviews of a periodic review PSB which can catch and neutralize the effect of prejudice on a periodic review PSB. The court therefore finds that the potential lack of impartiality of the March 15, 1982 periodic review PSB did not undermine the fairness of the summary review

---

1. The extensiveness of the review structure and the requirement of a summary review PSB's independent determination serves to distinguish this case from *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), which Dr. Zaky cites for the proposition that fair and impartial initial review is essential to fair and impartial process. *Morrissey* involved a parole revocation where *no* initial hearing was provided. Here, the July 14, 1982 summary review PSB is itself an "initial hearing" on the issue of Dr. Zaky's performance in the sense that it first considered whether separation would be appropriate, so that the alleged bias of the March 15, 1982 periodic review PSB is irrelevant.

process which led to Dr. Zaky's separation from the V.A.[2]

Finally, the court finds that the members of the July 14, 1982 summary review PSB which actually began the separation process were not people whom Dr. Zaky alleged harbored any potential prejudice against him. Thus, the court finds that no lack of fairness or impartiality influenced the decision to separate Dr. Zaky.

■ The second alleged undermining of impartiality was the delay in holding the summary review PSB meeting. As was discussed earlier, Dr. Zaky received a letter on April 9, 1982 which stated that the summary review would be held on April 15, 1982. On April 14, 1982, Dr. Guo sent a letter stating that a decision to postpone the review for two months had been made, with the hope that "this postponement will provide you and your supervisor the time to communicate further concerning your alleged deficiencies and to work toward any improvement or correction indicated." The letter said that the postponed review would consider new allegations of deficiencies, and would review Dr. Zaky's record up to the date of the review.

Dr. Zaky believes that the postponement raises an issue as to the validity of the charges and the motives of those who made them. The court does not find such an issue to exist. It is clear that the postponement was effectuated for Dr. Zaky's benefit. It gave him additional time to iron out his differences with his superiors, and promised that the postponed review would consider his record up to the date of the review, so that if he exhibited improvement in his attitude and actions, the PSB would be able to review those facts. The court therefore finds that the delay did not undermine the fairness of the review process.

■ The third impartiality charge is that the June 17, 1982 PSB was of questionable impartiality. The court finds this claim irrelevant because the June 17, 1982 board, which was apparently the Board postponed from April 15, 1982, did not conduct a summary review, but simply reviewed Dr. Zaky's record and determined that the July 14, 1982 summary review PSB should be convened. Even if the June 17, 1982 Board was not impartial, it had no effect on the impartiality of the summary review PSB in much the same way that the March 15, 1982 PSB had no effect.

The last allegation is that the July 14, 1982 PSB was not impartial because of the prejudice of Dr. Haan. It is clear, however, that Dr. Haan was not a member of the July 14, 1982 PSB. *See* Defendants' Exhibit 7, Document entitled "Board Action," which shows that Dr. Guo, Dr. Palileo, and Dr. Weiner were the members of the PSB. Dr. Haan's only involvement with the July 14, 1982 proceeding was as a witness, and the PSB was independent enough to assess Dr. Haan's testimony. The court therefore finds that the July 14, 1982 summary review PSB was impartial.

The court concludes that all relevant V.A. regulations were followed in this case, and that the summary review process which resulted in Dr. Zaky's separation was fair and impartial. A cause of action based on 38 U.S.C. § 4106 must therefore fail, and it would be "a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained." *Mason v. Continental Illinois National Bank*, 704 F.2d 361, 367 (7th Cir.1983).

For the above stated reasons, the defendants' Motion for Summary Judgment on plaintiff's § 4106 claim is hereby GRANTED.

---

**2.** Nor does the court find that the alleged bias of the periodic review PSB gives Dr. Zaky a § 4106 cause of action in and of itself. It is clear that Dr. Zaky complains of his separation from the V.A. as well as the presence in his file of charges against him. However, the March 15, 1982 PSB was not involved in the separation decision and the alleged deficiencies found by the March 15, 1982 PSB are the subject of the eight deficiencies independently found by the July 14, 1982 summary review PSB to be supported by the evidence. Thus, the actions of the March 15, 1982 PSB are irrelevant to Dr. Zaky's alleged injuries, so that this cause of action cannot be maintained on the allegation of bias against the March 15, 1982 PSB alone.

APPENDIX A

July 1, 1974

MP–5, Part II
Chapter 4

## CONTENTS

### CHAPTER 4.  PROBATIONARY PERIOD

PARAGRAPH                                                    PAGE

1.  Scope ...................................................................... 465
2.  References ................................................................. 465
3.  Policy ..................................................................... 465
4.  Review of Employee Records ......................................... 465
5.  Creditable Service ...................................................... 466
6.  Requirement for Serving New Probationary Period .................... 466
7.  Penalty Actions ......................................................... 466

## CHAPTER 4.
## PROBATIONARY PERIOD

### 1.  SCOPE

The provisions of this chapter apply to physicians, dentists, and nurses appointed under the authority of 38 U.S.C. 4104(1). The chapter contains a statement of basic policy concerning utilization of the 3-year probationary period in determining which employees shall be retained in the Department of Medicine and Surgery. It also establishes requirements for making such determination on the basis of review of employee records during the probationary period.

### 2.  REFERENCES

38 U.S.C. 4104(1) and 4106(b).  (See par. 6, Introduction to this part.)

### 3.  POLICY

Retention of employees in the Department of Medicine and Surgery during the 2-year probationary period shall be contingent upon demonstration of satisfactory professional qualifications and personal suitability on a continuing basis.  Only those employees who satisfactorily complete the probationary period shall acquire permanent status in the Department of Medicine and Surgery.

### 4.  REVIEW OF EMPLOYEE RECORDS

a.  Each employee who is subject to completion of the probationary requirements of 38 U.S.C. 4106(b) shall have his record reviewed in a fair and impartial manner by a Professional Standards Board during his probationary period to determine whether his employment in the Department of Medicine and Surgery shall be continued.  These reviews shall be based on the need therefor to insure that every reasonable step is taken to ascertain whether employees are fully qualified and satisfactory.

b.  Upon completion of each review, if the employee is found to be fully qualified and satisfactory, this shall be confirmed in writing by the reviewing board.

c.  If during the review of the record there is evidence that an employee may not be fully qualified and satisfactory, he shall be so advised in writing by the reviewing board.  Notification to the employee will include:

(1) Reasons for the review.

(2) That he may appear personally before the board or submit a written state-

ment in his behalf before a final decision is made.

(3) That he is not entitled to legal or other representation during conduct of the review.

d. Findings and recommendations of the Professional Standards Board will be based on a review of the employee's record and evidence presented during conduct of the review.

e. If the decision is that the employee is not fully qualified and satisfactory, he will be separated from the service. Approving authority for Professional Standards Boards findings is the Chief Medical Director or his designee.

f. The record of an employee who completes the 3-year probationary period while on active military duty will, upon his return from such duty, be reviewed by a board to determine whether he is fully qualified and satisfactory.

### 5. CREDITABLE SERVICE

The following service shall be creditable toward completion of the probationary period.

a. Continuous service rendered in an appointment made under authority of 38 U.S.C. 4103.

b. Continuous service rendered in an appointment made under authority of 38 U.S.C. 4104(1).

c. Leave with pay.

d. Leave without pay not exceeding a total of 60 calendar days [for physicians and dentists or 352 hours (44 workdays) for nurses] during the 3-year probationary period.

e. Satisfactory service of at least 6 months duration in a probationary period prior to a break in service of 1 year or less. However, prior employment may be credited only when the break in service results from the employee's resignation or involuntary separation through no fault of his own. A break in service is defined for the purpose of this subparagraph as a period during which no service is rendered under authority of 38 U.S.C. ch. 73.

f. Satisfactory service in a probationary period served under authority of 38 U.S.C. ch. 73 prior to holding some other type of appointment in the Department of Medicine and Surgery if the employee is subsequently appointed under 38 U.S.C. 4104(1), provided the conditions of subparagraph e, above, are met.

g. Time spent in a probationary period prior to separation for active military service and the time spent while on active duty if the employee exercises his statutory restoration rights.

### 6. REQUIREMENT FOR SERVING NEW PROBATIONARY PERIOD

Persons who have satisfactorily completed the 2-year probationary period required by 38 U.S.C. 4106(b) prior to separation will not be required to serve a new probationary period upon reemployment unless their separation was for cause.

### 7. PENALTY ACTIONS

a. An employee who commits, during his probationary period, a breach of discipline not serious enough to justify separation from the service may be corrected by imposition of a lesser penalty. This may be either an admonishment or a reprimand depending upon the nature of the offense and other pertinent circumstances.

b. An admonishment is a simple written reproval of an employee for some infraction that is not of a serious nature or is a warning against repetition of the infraction.

c. A reprimand is a statement of official censure in a formal letter to the employee for some infraction of a marked degree of seriousness.

d. Penalty actions may be imposed as result of board review of an employee's services as outlined in paragraph 4, above, or by supervisory officials when the violation is less serious.

e. The Chief Medical Director and heads of field stations, or their designees, are authorized to admonish or reprimand employees under their respective jurisdictions during the probationary period.

June 1, 1964

DM&S Supplement
MP-5, Part II

# CONTENTS

### CHAPTER 4. PROBATIONARY PERIOD

PARAGRAPH                                                                  PAGE

4.01 Scope.........................................................................467
4.02 References...................................................................467
4.03 Purpose of the Probationary Period ....................................467
4.04 Authority and Responsibility ...........................................468
4.05 Types of Reviews ..........................................................468
4.06 Procedure for Board Reviews ...........................................470
4.07 Penalty Actions ...........................................................472
4.08 Action Upon Completion of the Probationary Period...................473
4.09 Creditable Service ........................................................473

## RESCISSIONS

The following material is rescinded:

## 1. COMPLETE RESCISSIONS

a. *Manuals*

Chapter 4, Chapter 16B, DM & S Supplement, MP-5

## CHAPTER 4.
## PROBATIONARY PERIOD

## 4.01 SCOPE

a. This chapter contains instructions and procedures necessary to effectively implement policies prescribed in VA Manual MP-5, part II, chapter 4.

b. It applies to all probational appointments of physicians, dentists and nurses.

## 4.02 REFERENCES

a. 38 U.S.C. 4104(1) and 4106(b).

b. MP-5, part II, chapter 4.

c. MP-5, part II, chapters 2 and 9 and related DM & S Supplements.

## 4.03 PURPOSE OF THE PROBATIONARY PERIOD

a. The probationary period is an extension of the appointment process. It provides the final test, that of actual performance on the job. During the probationary period, the employee's conduct, general character traits, and performance in the actual work situation may be closely observed, and he may be separated from the service without undue formality if circumstances so warrant. Thus, the probationary period protects management against the retention of any person, who, in spite of having met legal and regulatory requirements for appointment, is found in actual practice to be unsuited, professionally or otherwise, for permanent appointment in the Department of Medicine and Surgery.

b. The probationary period also affords an opportunity for fostering the interest of the employee. Intelligent and considerate treatment during the probationary period will often have a lasting effect on his career. It will often save for useful and efficient service employees who would otherwise be separated, or retained in assign-

ments in which they have little prospect of success.

c. The probationary period cannot serve as a full and fair trial period without the cooperation of supervisors at all levels. New employees, particularly those with no prior Federal service, should not be expected to immediately render the services which would normally be required of experienced and trained employees. During the initial period of employment, a sincere effort must be made by supervisors and personnel officials to orient employees into the new work situation and to provide essential training and indoctrination.

## 4.04 AUTHORITY AND RESPONSIBILITY

a. *Legal Basis.* 38 U.S.C. 4106(b) requires a 3-year probationary period during which the services of physicians, dentists and nurses shall be reviewed and the separation of those employees who are not found fully qualified and satisfactory.

b. *Individual Responsibility*

(1) *Supervisors.* Supervisors are to continually review the services of employees serving in a probationary status. Supervisors must assure by active measures that the employment record of unsatisfactory employees or of those whose services are merely borderline are promptly referred for action.

(2) *Chief of Staff.* Upon the recommendation of the service chief, Chiefs of Staff are responsible for determining the need for a Professional Standards Board review of the services of employees at any time during the probationary period.

(3) *Professional Standards Boards.* Professional Standards Boards have the overall responsibility for reviewing the records of each employee serving a probationary period when requested by the Chief of Staff. The board will conduct such reviews as may be necessary under the circumstances and in accordance with the instructions contained in this chapter.

(4) *Personnel Officers.* They serve as technical advisers to Professional Stan-

dards Boards. In this capacity, they have responsibility for rendering assistance and advice to members of the board in the conduct of their reviews, and for ensuring that the reviews and actions following review conform with applicable laws, VA policies and instructions.

c. *Approval Authority for Board Action Recommendations*

(1) *Separations.* See MP-5, part II, chapter 9 and DM & S Supplement thereto.

(2) *Admonishments, Reprimands, or Retention in the Service*

(a) Chief Medical Director for Central Office employees.

(b) Chief Med. Dir. or designee for employees occupying centralized positions.

(c) Field station Directors and Managers for employees occupying decentralized positions.

## 4.05 TYPES OF REVIEWS

a. *General.* There are three types of service reviews during the probationary period:

(1) *Supervisory reviews* through observation and evaluation of an employee's performance on a continuing basis.

(2) *Periodic reviews* of the services of each probational employee conducted by the chief of service and the Professional Standards Board.

(3) *Summary reviews* conducted by Professional Standards Boards and limited to situations when summary separation from the service may be justified.

b. *Supervisory Reviews*

(1) Supervisors are to review the services of physicians, dentists and nurses on a continuing basis through observation and evaluation of their performance during the probationary period. They will be aware of their responsibilities in this connection at all times, not only from the standpoint of judging employee performance but by initially fulfilling the supervisory responsibilities of acclimating the probationary employees to their work environment; carefully explaining the nature of the duties and

responsibilities of the position, together with opportunities for development; and informing employees of necessary VA policies and local regulations governing employment and conduct.

(2) After a sufficient period of time has elapsed during which the employee has had ample opportunity to learn what is expected of him, the supervisor must then give more serious consideration to inadequacies which he may observe. It is at this point that the counseling program should be used if it is to be effective. The employee's weak points will be discussed objectively and suggestions made for the solution or elimination of such inadequacies. If his performance is considered good or outstanding in some respects, this fact also will be made known to the employee and he should be encouraged to bring all aspects of his job up to the same level. If, after subsequent counseling, the employee's adjustment and performance is not satisfactory, the service chief will recommend to the Chief of Staff, that a review of the employee's services be made by a Professional Standards Board. This will be accomplished by memorandum setting forth the specific deficiencies of the employee or the manner in which he has failed to properly adjust to his assignment, as well as a summary of the efforts of the supervisor to assist the employee, such as counseling, reassignment, etc. A special proficiency report will be prepared for the employee prior to his appearance before the Professional Standards Board unless there is a rating on record less than 3 months old.

(3) The steps necessary to separate deficient employees shall be initiated at any time during the probationary period that the need for such action becomes manifest. This is true, regardless of past or pending proficiency ratings, counseling, or the result of any previous review which served to evaluate performance during the probationary period.

c. *Periodic Reviews*

(1) Chiefs of services and Professional Standards Boards shall have joint responsibility for periodically reviewing the services of each probationary employee. As a minimum, one review will be conducted during the probationary period. It will be made on the due date of the first proficiency rating report. The first periodic review will ordinarily be made by the chief of service and the Professional Standards Board. The chief of service and the immediate supervisor of the employee will be alerted of the due date of the review by the personnel office.

(a) The source document for these reviews will be the current proficiency rating report. However, the entire employment record will be made available to the reviewer and/or the Professional Standards Board for review.

(b) Each of these reviews will originate with the chief of service, except that in the case of nurses the Chief, Nursing Service, may designate members of her staff, preferably the immediate supervisor, to conduct the review.

(c) The proficiency rating report, related material, and any additional report which the reviewer may wish to make will be sent through channels to a Professional Standards Board for review and necessary action. (See par. 4.06a for action by board.) The services of an employee at the end of the 1st year need not be reviewed by a board unless the Chief of Staff, upon recommendation of the chief of service, requests the review.

(2) In addition to the above reviews, Professional Standards Boards shall review the services of a probational employee when necessary under circumstances stated in subparagraph b above.

(3) Central Office Professional Standards Boards shall conduct service reviews of a probational employee who is serving as Chief of Staff or Chief, Dental Service.

d. *Summary Reviews.* Field station heads or Chiefs of Staff will authorize Professional Standards Boards to conduct immediate reviews when circumstances may justify consideration of summary separation from the service; for example, mistreatment or abuse of patients, conduct

unbecoming a Government employee, or direct disobedience. If the situation is sufficiently grave, the field station head upon the recommendation of the Chief of Staff, may suspend the employee or place him on annual leave (depending upon the nature of the offense), pending board review and final decision. However, a period of suspension may not exceed 30 calendar days without prior approval of the Chief Medical Director. [ ] Notice of any proposed suspension will be sent immediately [ ] to the Chief Medical Director. [ ] The employee will be notified of the suspension by issuance of [ ] Notification of Personnel Action. The "Remarks" space of the [form] will contain the reasons for the action and will inform the employee that he will receive separate notification of the time and date of the proposed review by a board. A copy of the suspension action [ ] will be sent to Central Office for those employees for which board action folders are maintained. (See MP-5, pt. I, ch. [293.) ]

## 4.06 PROCEDURE FOR BOARD REVIEWS

a. *General*

(1) In conducting reviews, the Professional Standards Board will have access to the entire employment record of the employee, including proficiency ratings, counseling reports, and evaluations by supervisory personnel. The board will carefully consider all aspects of the employee's service, including warning signs, such as may be evidenced by borderline proficiency ratings, either in total element score or specific element ratings.

(2) The results of each review by the Professional Standards Board will be processed as follows:

(a) If the employee's services are fully satisfactory or no serious deficiencies are noted, the board need not take formal board action, but may record its findings on the proficiency rating report or prepare a separate memorandum report. The employee will be informed in writing of the results of the review by his immediate su-

pervisor. The review record and copy of the notification to the employee will be sent to the personnel office for filing in the employee's folder.

(b) If serious deficiencies are noted, the procedures outlined below will be followed.

b. *Notice to Employee.* The employee will be notified in writing of the review by the Professional Standards Board. The letter will be prepared by the personnel office for the signature of the Chairman, Professional Standards Board, and as a minimum will contain the following:

(1) The time and date of the proposed review as well as a statement of the reasons—brief, but in sufficient detail so that the employee will clearly understand why his services are considered deficient and/or the nature of the incident involved. Reference will also be made to 38 U.S.C. 4106(b).

(2) A statement that the employee may appear in person before the board to present his side of the case, or submit a written statement in his behalf. He will be told that if he elects to submit a written statement, the board's recommendation will be based solely upon a careful review and analysis of the records and facts in the case, the information furnished by the employee and others who may be called by the board.

(3) Explanation that the purpose of the board is to conduct an impartial review of his services and to make recommendations to the Chief Medical Director [ ] or field station head, as appropriate, whose decision is final.

(4) Notification that the review is being conducted during the employee's probationary period and that he has no entitlement to legal or other representation. However, upon request, he will be given assistance in preparing his case, or he may seek assistance in his behalf from within the VA.

(5) Notice that a reasonable time limitation will be set for the employee's reply as to whether or not he desires to appear before the board or submit a written statement.

c. *Conduct of Review.* The principal function of the board during the course of reviewing the services of the employee during the probationary period is to obtain all the facts bearing upon his adjustment and performance in order to arrive at a sound recommendation. Interviews with the employee, supervisors, or others should be conducted in an informal manner. The board interviews will be held in privacy and the employee will not be present while others are being questioned. The employee or any others who may be called upon to furnish information will not be subject to cross-examination procedures and the Chairman of the Board will be responsible for monitoring the questioning to ensure that this does not occur. Questions by any members of the board should be clearly stated and should have a direct bearing on the purpose of the review. The employee will be informed to answer all questions simply and directly, and should not be permitted to digress from the subject.

(1) Oaths or affirmation will not be required nor administered in connection with the board review.

(2) The Chairman will inform the employee, if present, of the reasons for the review, the legal authority therefor, and refer to prior notice which was furnished to him.

(3) All members designated to serve on the review board will be present throughout the entire time the review is conducted.

(4) A verbatim recording need not be made of information given during the course of the review unless, in the opinion of the Chairman, such action is necessary.

(5) The Personnel Officer (or the person acting for him) will be present to serve the board as a technical adviser.

(6) In order to obtain all of the essential facts, the Chairman may call persons who are believed to possess pertinent information about the subject employee or the circumstances which warranted the review. Persons called by the Chairman will be requested to appear before the board and answer questions. It is the duty of each employee called to furnish information freely and honestly, whether it be favorable or unfavorable to the employee whose case is under consideration, and employees will be so informed before they are interrogated.

(7) VA patients will not be called upon for information or otherwise be involved in board reviews except in those rare, extreme cases when such action is considered essential and will not be detrimental to the health and welfare of the patient or the best interest of the VA.

(8) Attendance at the review will be restricted at all times solely to those persons who, in the opinion of the Chairman, have a direct connection with the case.

(9) Persons in a position to prejudice the action of the board may not serve as members of the board conducting the review.

d. *Recommendation of Board.* Upon completion of the board review, the board will meet in closed session to discuss its findings and arrive at an appropriate recommendation. The board may recommend any one or appropriate combination of the following—counseling, retention in the service, admonishment, reprimand, or separation. When the recommendation of the board has been reached, VA Form 10–2543, Board Action, will be completed in duplicate as follows:

(1) *Findings.* Item 8 will contain the complete details of the findings, including any reviews of the records which have been made as well as a brief but concise summary of only that information obtained through interviews determined by the board to have a direct relevancy to the service or conduct of the employee. If a verbatim recording of the interviews is made, a copy should be appended to each copy of the VA Form 10–2543 as well as any other pertinent documents or exhibits.

(2) *Recommendation.* Item 9 will contain the specific recommendation of the board.

(3) *Conclusions.* Item 13 will contain the conclusions reached by the board which substantiate the recommendation as well as

any additional pertinent remarks in support thereof.

(4) *Other Items.* All other pertinent items will be completed in the usual manner.

e. *Action by Station.* Immediately following action by the Professional Standards Board, the report of board action will be sent to the Chief of Staff, for review. He will transmit the board action together with his recommendation to the field station head. This recommendation will be developed in consultation with the chief of service. If the field station head is the approving authority for the action, he will indicate his action by completing item 17 of VA Form 10–2543. Otherwise, his comments and recommendations will be transmitted by letter, accompanied by both copies of the board action report and related material to the Chief Medical Director [  ] for approval.

f. [ (Deleted by change 1.) ]

g. *Action by Central Office.* For actions requiring approval of the Chief Medical Director, the Chairman, Special Boards, will authorize the appropriate Professional Standards Board in Central Office to review the case. A representative of the Personnel Service will serve the board in an advisory capacity and will provide any technical assistance which may be required. The board may make its recommendation to the Chief Medical Director on the basis of the record, or it may call the employee or other persons for additional information prior to making final recommendation to the Chief Medical Director.

h. *Placing Approved Recommendations Into Effect*

(1) *Separation.* See MP–5, part II, chapter 9, and related supplement, for procedures governing separation accounts.

(2) *Retention.* If the employee's retention in the service is approved, the personnel office will so notify the employee by letter over the signature of the field station head. Immediately thereafter counseling conferences will be conducted by the supervisor at necessary intervals to offer guidance and assistance to the employee with a view toward eliminating any deficiencies or inadequacies which were apparent prior to the board review. Close observation and supervision will be given the employee to ensure that his services are considered completely satisfactory prior to completion of the probationary period.

(3) *Admonishment or Reprimand.* If an admonishment or reprimand is approved, the necessary letter will be prepared by the Chief of Staff, for the signature of the field station head. The letter will be given to the employee by his service chief, who will carefully explain the basis for the action and what the employee can do to ensure that a subsequent and more severe action will not be necessary.

4.07  PENALTY ACTIONS

a. *General*

(1) These are actions that may be imposed during the probationary period to correct an employee for a violation of a rule of conduct, law or regulation, official instruction, or specified responsibility which is not serious enough to justify separation from the service.

(2) There are two penalty actions—admonishment and reprimand.

(3) Penalty actions may be imposed as result of a review of an employee's services by a Professional Standards Board or by supervisory officials independent of board action if the violation is not serious enough to justify referral to a board for review. Referrals should not be made to Professional Standards Boards of violations which normally are the responsibility of supervisory officials.

b. *Admonishment.* An admonishment will be written. It will be prepared for the signature of the field station head when the admonishment results from a recommendation by the Professional Standards Board subsequent to a board review.

c. *Reprimand.* A reprimand will be written and prepared for the signature of the official authorized to approve penalty actions. When the reprimand results from

a recommendation by the Professional Standards Board subsequent to board review, the reprimand will be prepared for the signature of the field station head.

d. *Designations of Officials To Approve Penalty Actions.* The field station head will designate officials who may admonish and reprimand employees under his jurisdiction in accordance with the following:

(1) *Admonishment.* The official who may sign a letter of admonishment will be the official who has good knowledge of the facts involved and is in the normal supervisory channels.

(2) *Reprimand.* The official who may sign a letter of reprimand will in no case be lower than a chief of service.

## 4.08 ACTION UPON COMPLETION OF THE PROBATIONARY PERIOD

a. Each employee who satisfactorily completes the probationary period will automatically attain permanent status.

b. Some form of acknowledgment to those who acquire permanent status is desirable. For example, a congratulatory letter to the employee over the signature of field station head, or an item in the station's news bulletin.

c. No formal personnel action is required to confirm the completion of the probationary period.

## 4.09 CREDITABLE SERVICE

For service creditable toward completion of the 2-year probationary period, see MP–5, part II, chapter 4, paragraph 5.