**Steven L. SHAFER, Plaintiff,**

v.

**CITY OF FORT WAYNE and Lawrence D. Consalvos, Defendants.**

**Civ. No. F 85–19.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Jan. 23, 1986.

John C. Theisen and Kim Alan Armstrong, Gallucci, Hopkins & Theisen, Fort Wayne, Ind., for plaintiff.

T. Dean Swihart and Bruce O. Boxberger, Grotrian & Boxberger, Fort Wayne, Ind., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. This case deals with alleged violations of the first amendment, 42 U.S.C. § 1983, as well as state constitutional, contract and municipal ordinance violations arising out of the consolidation of certain accounting functions in the Fort Wayne Department of Public Safety and the transfer of plaintiff from an accounts officer to a combat position in the Fort Wayne Fire Department. Having examined and considered the entire record, having determined the credibility of the witnesses after viewing their demeanor and considering their interests,[1] and being duly advised, the

1. The court makes two specific credibility determinations. First, the court finds the testimony of Anthony Hodges to be noncredible. His reliability was specifically impugned by several witnesses. His testimony concerning comments made by defendant Consalvos was not corroborated by other witnesses who were allegedly present, including Noble Schlatter and Thomas Heckman.

Second, although plaintiff has made an issue out of defendant Consalvos' inability to correctly recall the dates of certain events, the court finds that these chronological mistakes were not

court hereby enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

The plaintiff, Steven L. Shafer, is an individual citizen and resident of Fort Wayne, Allen County, Indiana, who has been employed by the City of Fort Wayne Fire Department since on or about March 1970. The defendant, City of Fort Wayne ("City"), is a municipal corporation organized under the laws of the State of Indiana. The defendant, Lawrence D. Consalvos ("Consalvos"), is an individual citizen and a resident of Fort Wayne, Allen County, Indiana, and was at all times relevant to this cause either an applicant for or the incumbent Safety Director of the City of Fort Wayne, a position to which he was appointed on or about September 19, 1984. As Safety Director of the City of Fort Wayne, Consalvos was a division head, responsible for the operations of the Fort Wayne Fire Department, Fort Wayne Police Department, Humane Shelter, Communications Department, and Office of Civil Defense, and had authority with regard to those departments to re-organize the departments, transfer work, and eliminate positions.

Shafer served in the Operations Division of the Fort Wayne Fire Department for approximately ten years (from 1970 through 1980), was promoted to the rank of lieutenant and transferred to the Fire Prevention Bureau on or about July 1980. He served in the Fire Prevention Bureau for approximately ten months, and was promoted to the rank of platoon captain in 1981. He became accounts officer for the Fort Wayne Fire Department, which position he held until his transfer to the Operations Division. Shafer was notified of his transfer to the Operations Division by letter dated December 21, 1984, said transfer being effective January 7, 1985. After his transfer to the Operations Division, Shafer continued to hold the rank of platoon cap-

tain and his salary and all benefits · m-ployment, with the exception of h· ir; on duty, did not change following his transfer. As an accounts officer, prior to his transfer, Shafer worked a five-day/40-hour week. After his transfer to the Operations Division, Shafer was required to work a 56-hour week, on a one-day-on/two-day-off schedule. Because of an injury received immediately after his transfer to the Operations Division, Shafer never assumed the duties as a Platoon Captain in the Operations Division and has been assigned to "light duty" jobs since the time of his injury.

Prior to the appointment of Consalvos to the position of Safety Director, the various departments of the Division of Public Safety engaged in individual accounting and purchasing practices without regard for inter-departmental needs or overall city budgets. City administrators who had interviewed Consalvos prior to his employment questioned him regarding his experience and possible solution for departmental organization and financial control. During the interview process, defendant Consalvos expressed his view that departmental control and re-organization would include the consolidation of accounting and budget functions. Consalvos, upon notification of his appointment, stated that he would move to consolidate the budget and accounting duties and functions of the various departments of the Division of Public Safety. Defendant Consalvos was considering the consolidation of accounting jobs and budget functions prior to his arrival in Fort Wayne in September 1984. After his arrival in Fort Wayne, Consalvos began gathering information regarding the accounting duties in the various departments in the Division of Safety.

Defendant Consalvos in his capacity as Safety Director, reorganized the various departments under his authority by, among other things, consolidating the accounting functions performed in the Fire, Police, Communications and Humane Shelter departments into one job. The City personnel

contrived and do not undercut Consalvos' essen-

tial credibility on the main issues in this case.

department considered the position to be administrative assistant to Consalvos. The City had a practice of allowing administrative positions such as this to be filled by "lateral transfers" from the same pay grade positions in other departments without the posting of the position under job bidding guidelines set forth in City personnel policies. Robert Ebert laterally transferred from his position with the Board of Works into this new administrative assistant position. The consolidation of these accounting functions was undertaken pursuant to Consalvos' desire as expressed during his interview for his Director of Public Safety position, and was not done in response to or as a result of any conduct or comments by Shafer.

As a result of the consolidation, some of the people previously performing accounting duties, including Steven Shafer, were re-assigned to other duties. At the time of Shafer's re-assignment and transfer, the Operations Division of the Fire Department was undermanned and in need of additional personnel. There was an understanding at that time between the Fire Department and the Union that 40-hour positions would not be filled until the undermanning of the Operations Division was alleviated. Shafer's transfer to the Operations Division was effected because of the manpower shortage in the Division and not as a result of any conduct or comments by Shafer.

Shortly after his arrival in Fort Wayne, Consalvos became involved in the contract negotiations between the City and Local No. 124 of the International Association of Firefighters. The original contract expired on November 16, 1984, and was verbally extended thirty days to December 16, 1984. At the time of Consalvos' arrival, the City was represented in the contract negotiations primarily by Anthony Hodges, Thomas Heckman, and Noble Schlatter. Anthony Hodges served as chief negotiator and spokesman for the negotiating team. The Union was represented by, among others, David Fyock (as spokesman) and Steve Shafer. Shafer had been a member of the Fort Wayne Professional Firefighters' Association Local No. 124 since on or about

March 1970 and became a union steward for Local No. 124 on or about January 1984. Shafer's responsibility as a union steward was to the platoon captains, of which he was one. Sometime prior to November 2, 1984, the City and Union reached an agreement on a tentative contract, which the Union committee members were to present to the general union membership for ratification. At the time the tentative agreement was reached, it was understood by both bargaining committees that the Union committee members would support the tentative agreement and recommend the same to the general union membership. Shortly after the tentative agreement was reached, the Union committee members, including Shafer, advised City negotiators that they had reservations about the agreement and that they could not and would not recommend its passage to the general union membership. These concerns related primarily to the status of platoon captains under the agreement. The Union negotiators, including Shafer, actively lobbied against the approval of the tentative agreement and it was defeated unanimously by the general union membership. Following the defeat of the initial tentative agreement, Shafer and Consalvos met on several occasions to attempt to resolve the problems that had arisen with respect to the treatment of platoon captains under the proposed agreement. Sometime after the rejection of the initial tentative agreement, a second proposed contract was submitted to the union membership. At an open union meeting where Consalvos appeared to discuss the second proposed contract, Shafer asked certain questions of Consalvos regarding specifically the status of platoon captains under the second proposed agreement and how a platoon captain might be transferred. Consalvos responded to the question by pointing out to those assembled that Shafer's question dealt specifically with his own status under the proposed contract. The second proposed contract was also defeated. A contract was ultimately ratified between the City and Local No. 124 in February, 1985 which was ex-

pressly retroactive to January 1, 1985, and under which the Union accepted a two percent less pay increase than that offered in the original tentative contract.

Statements made by Shafer regarding the various contract proposals were made almost exclusively to City negotiators and other union members. These statements were generally made in personal conversations or small groups. These statements were not generally made to the news media or at public meetings and were not intended to inform the public or the media regarding the contract negotiations or the particular points of dispute between the negotiating committees. The content of Shafer's statements dealt almost exclusively with the specific terms of the proposed contract which related particularly to the group which he represented as union steward, to wit: platoon captains. Shafer's statements did not involve the ability of the officers involved, the quality of fire service in the City of Fort Wayne, or any general policy matters regarding the operation of the Fort Wayne Fire Department.

### Conclusions of Law

This court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 1331 and 1343, as well as pendent jurisdiction over the related state law claims. Jurisdiction over the parties is conceded by counsel.

Shafer asserts five causes of action: (1) a claim under the first amendment for violation of his right to freedom of speech and association; (2) a claim under 42 U.S.C. § 1983 for the violation of his right to freedom of speech; (3) a claim under article I, §§ 1, 3, 9 of the Indiana state constitution for violation of free speech rights; (4)

a breach of the collective bargaining agreement in several particulars; and (5) the violation of certain departmental regulations and municipal ordinances. Shafer conceded at final argument that the first three claims concerning freedom of speech and association are very similar, and that the legal analysis necessary to decide those claims is the same.[2] Therefore, the court will analyze the freedom of speech claims together, and then examine Shafer's fourth and fifth claims.

### Freedom of Speech Claims

Shafer claims that the consolidation of the accounting functions of the several Public Safety departments into one person, as well as the transfer of Shafer to the Combat Division instead of the Fire Prevention Bureau, were both undertaken in retaliation for Shafer advocating rejection of the first two collective bargaining contract proposals.

Public employees do not abandon their first amendment rights upon entering the work place. *Yoggerst v. Hedges,* 739 F.2d 293, 295 (7th Cir.1984). The Supreme Court has developed a two step analysis for determining whether an adverse employment decision violates the public employee's first amendment rights. The first step involves determining whether the employee's speech is protectable under the first amendment. This first step has two subsidiary requirements: the speech must have been on a "matter of public concern," *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); *Knapp v. Whitaker,* 757 F.2d 827, 839 (7th Cir. 1985); *Yoggerst,* 739 F.2d at 295; and the speech must have played a causative role in

---

**2.** Shafer's claim under 42 U.S.C. § 1983 necessarily rests on the same principles as the first amendment claim itself, as § 1983 is merely an enabling statute allowing for claims under the fourteenth amendment, which in turn incorporates the first amendment, making it applicable to the states. The principles underlying article I, § 9 of the Indiana Constitution, which guarantees freedom of speech, are such that there is a "fundamental interplay" between them and the first amendment. *Gintert v. Howard Publi-*

*cations, Inc.,* 565 F.Supp. 829, 837 (N.D.Ind. 1983). In the context of public employee suits based on violations of freedom of speech rights, Indiana courts have applied Supreme Court first amendment precedents, *see McQueeney v. Glenn,* 400 N.E.2d 806, 809–10 (Ind.App.1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 943, 67 L.Ed.2d 112 (1981). Therefore, the court will treat all three freedom of speech claims under the same first amendment analysis.

the adverse employment decision. *Givhan v. Western Line Consol. School District*, 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Mt. Healthy City Board of Educ. v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977); *Lasco v. Northern*, 733 F.2d 477, 480 (7th Cir.1984). If the plaintiff can establish this first step, then the court must balance the public employee's first amendment interests against those of the public employer. *Connick*, 461 U.S. at 150–51, 103 S.Ct. at 1692; *Givhan*, 439 U.S. at 414, 99 S.Ct. at 696; *Mt. Healthy Board of Educ.*, 429 U.S. at 284, 97 S.Ct. at 574; *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). The court begins by analyzing the first step of this methodology.

As noted above, Shafer's freedom of speech claims requires that he first establish that his speech was about a matter of public concern and that the consolidation of the accounting functions and Shafer's transfer back to the Combat Division were caused by his speech. For the sake of emphasis, the court begins with the second half of this analysis first.

■ The causation element of first amendment claims has been described as an initial burden on the plaintiff to show that his conduct was "a 'substantial factor' —or to put it in other words, that it was a 'motivating factor'" in the adverse employment decision. *Mt. Healty Bd. of Educ.*, 429 U.S. at 287, 97 S.Ct. at 576. If the plaintiff can carry this initial burden, the defendant is then allowed to show by a preponderance of the evidence that it would have reached the same employment decision even in the absence of the employee's protected conduct. *Givhan*, 439 U.S. at 416, 99 S.Ct. at 697; *Mt. Healthy Bd. of Educ.*, 429 U.S. at 287, 97 S.Ct. at 576. The rationale behind allowing defendants this chance to disprove causation is that

[a] rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of

the exercise of constitutionally protected conduct than he would have occupied had he done nothing ... The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct.

*Mt. Healthy Bd. of Educ.*, 429 U.S. at 285–86, 97 S.Ct. at 575.

[4] The facts of this case make it clear that neither the consolidation of the accounting functions of the fire, police, communications and Humane Shelter departments under Robert Ebert, nor Shafer's transfer to the Operations Division were motivated by Shafer's advocacy of rejection of the first and second collective bargaining contract proposals. The consolidation of the accounting functions was considered and adopted as an administrative goal by Consalvos in September, 1984, long before Shafer's speech took place. Shafer's transfer to the Operations Division, once his financial officer responsibilities were consolidated, was effectuated pursuant to the understanding between the Fire Department and the Union that 40-hour positions (such as the one in the Fire Prevention Bureau which Shafer wanted to be transferred to) would not be filled as long as the Operations Division was undermanned. Thus, the consolidation and transfer took place for reasons unrelated to Shafer's conduct in urging rejection of the contract proposals. Stated another way, Shafer has failed to meet his initial burden of showing that his conduct was a substantial or motivating factor in the adverse employment decision. Thus, Shafer has not proven the causation element of the first step of a first amendment claim analysis. *See e.g. O'Connor v. Peru State College*, 605 F.Supp. 753, 763 (D.Neb.1985).

■ The other element of this first analytical step requires that the speech or conduct in question be about a "matter of public concern." As the *Connick* Court stated:

When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to

the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

. . . . .

We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personal decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 146–47, 103 S.Ct. at 1689–90. Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement. *Id.* at 146–48, 103 S.Ct. at 1690; *Knapp*, 757 F.2d at 839; *Yoggerst*, 739 F.2d at 296; *Zaky v. Veterans Administration*, 605 F.Supp. 449, 456 (N.D.Ind.1985).

■ Shafer argues in his post-trial brief that his statements urging rejection of the contract proposals were matters of public concern because the collective bargaining agreement itself, being a contract entered into by the City, is a matter of public concern. However, the Seventh Circuit has cautioned against so characterizing speech "just because such a concern provided the impetus for speaking." *Yoggerst*, 739 F.2d at 296. The *Connick* Court itself warns that speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been a topic of communication to the public that might be of general interest." 461 U.S. at 148–49, n. 8, 103 S.Ct. at 1691, n. 8. While the subject of speech is an important part of the content factor in *Connick*, the fact that the form and context of the speech must also be considered suggests that the focus of a "matter of public concern" must be broader than the nature of the subject itself.

■ The content factor is considered to be the "most important" *Connick* factor.

*Yoggerst*, 739 F.2d at 296. Although no court has formulated a rule for determining when the content of an employee's speech makes that speech be on a matter of public concerns, courts have given indications of how to approach the analysis of the content factor. The *Connick* Court speaks of speech which seeks to inform the public that the employing agency is not performing its duty, is breaching the public trust or is engaged in wrongdoing. 461 U.S. at 146–49, 103 S.Ct. at 1690–91. In *Egger v. Phillips*, 710 F.2d 292, 316 (7th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), the Seventh Circuit spoke of speech "which implicates broader interests with societal ramifications." Thus, it appears that the content of an employee's speech must be a matter of importance to society at large and not to the employee alone if that speech is to be considered protectable under the first amendment.

■ Shafer's statements at issue here concerned the status of platoon captains under the contract proposals. Those proposals sought to remove the platoon captains from the bargaining unit, which would directly affect Shafer as both platoon captain and union steward. While the public at large may be concerned about the City securing a contract with its firefighters, it does not necessarily follow that the component parts of such a contract would involve "broader interests with societal ramifications." This is especially true of a provision concerning the status of platoon captain membership in the bargaining unit. Such a provision affects only the parties concerned; the public concern about the existence of a collective bargaining agreement is not affected by the platoon captain's union status, except perhaps in the derivative sense that the contract is not approved by the union because of such an issue. This speech content contrasts sharply with speech about the wages under the contract or whether a certain type of service would continue to be performed. Such subjects have societal ramifications because they affect the cost and type of

municipal services the public will receive. But union status of a small group of firefighters does not have such broad impact; while it may be very important to platoon captains, it is important as a personal concern. Shafer, in speaking out on the treatment of platoon captains, was speaking out for himself on a matter of personal, not public, concern.

That Shafer was concerned only with himself is most evident in the colloquy between Shafer and Consalvos at the union meeting on the second proposed contract. Shafer asked questions about platoon captains, and specifically how a platoon captain would be treated in a transfer. In short, Shafer wanted to know what would happen to him under the contract proposal. Consalvos pointed out to the union membership that Shafer was negotiating for himself. Shafer claims that this evidences Consalvos' desire to "get" Shafer, but Consalvos was only speaking the truth. Shafer's speech at that meeting, and his speech about the contract in general, evidences only a personal concern for *Shafer's* status under the proposed contracts.

■ Nor can Shafer's advocacy of rejecting the entire contract proposal make his speech a matter of public concern. The reason offered for rejection was personal—the status of platoon captains. The implication of the *Yoggerst* case is that the employee's motivation for speaking is important to determining whether the employee is speaking personally or as a citizen on a matter of public concern. The fact that Shafer was advancing his own interests as platoon captain by speaking out removes his speech from the *Connick* and *Yoggerst* guidelines of what constitutes a matter of public concern.

■ The context and form factors do not alter this conclusion. Shafer made his statements only to City negotiators and union members; no attempt was made to pass these comments to the news media or the public at large, nor were they intended to inform the public about the contract negotiations or the provisions of the contract proposals. This contrasts sharply with Seventh Circuit case law finding speech to be about matters of public concern when it was an "attempt" or "intended" to inform the public on certain matters of public importance. *See Knapp,* 757 F.2d at 840–41; *Yoggerst,* 739 F.2d at 296; *Egger,* 710 F.2d at 306–17. Although the private communication of protected speech does not forfeit first amendment protections, *Givhan,* 439 U.S. at 414, 99 S.Ct. at 696, the private context of Shafer's speech reinforces the conclusion that Shafer was pursuing a personal (or, at best, internal union) goal that had no broader application or ramification. The court therefore concludes as a matter of law that Shafer's speech was on a matter of personal concern, so that it was not protected by the first amendment.[3]

---

**3.** Shafer cites four cases for the proposition that statements about collective bargaining agreements are protected speech. In *Walje v. City of Winchester,* 773 F.2d 729 (6th Cir.1985), the employee apparently communicated firefighters' grievances concerning job training, work conditions and pay to local newspapers and a radio station. In *Bickel v. Burkhart,* 632 F.2d 1251 (5th Cir.1980), a firefighter was fired after making statements concerning defective equipment and the perception of the department among other firefighters. The contents of these statements are clearly matters of public concern because they relate to the quality and cost of the municipal services received by citizens. They are therefore distinguishable.

More troubling is the *Knapp* case and *McGill v. Bd. of Educ. of Pekin Elementary School,* 602 F.2d 774, 778 (7th Cir.1979). In *Knapp,* the Seventh Circuit seemed to indicate that a teacher's comments about the grievance procedure under the teachers' contract was comment on a matter of public concern because "the grievance procedure was the subject of ongoing collective bargaining negotiations between the teachers' union and the administrators of the school district." 757 F.2d at 841. Without explaining why, the *Knapp* court stated "[i]n the context of this case, the grievance procedure was a legitimate matter of interest for the citizens of Peoria who, as taxpayers, had a financial stake in the settlement reached between the teachers and the [School Board]." *Id.* at 842. The *McGill* court held that adjudicating a collective bargaining agreement in the teachers' lounge and at a school board meeting was a matter of public concern. 602 F.2d at 778. However, these cases can be distinguished by the lack of a personal motive behind the speech. The com-

In summary, the court finds that Shafer has completely failed to satisfy the first step of first amendment analysis. His speech was not protected speech on a matter of public concern, and there is no causal link between his speech and the adverse employment decisions he claims befell him. Because the first step is unsatisfied, there is no need to proceed to the second step of balancing Shafer's interests with those of the City. *Connick*, 461 U.S. at 145–46, 103 S.Ct. at 1689; *Yoggerst*, 739 F.2d at 295; *Zaky*, 605 F.Supp. at 456. Shafer's freedom of speech claims therefore fail.

### Breach of Contract Claims

Shafer claims that the collectively bargained contract between the City and the union was breached in several respects by the consolidation of accounting functions and Shafer's transfer to the Operations Division. An initial issue to resolve is which (if any) contract applies to Shafer's claim. One contract was in effect until December 16, 1984 (the "old" contract), while the other was made effective from January 1, 1985. Shafer's brief references the old contract, even though his transfer was not effective until January 7, 1985. The relevant provisions of the old and new contracts are sufficiently similar (except for changes in numbering), so that the question of which contract applies is not important.

However, the City argues that because Shafer received notice of his transfer on December 21, 1984—during the hiatus between the two contracts—no contract claims can be asserted. This argument is unpersuasive. To the extent that the consolidation of accounting functions allegedly breached the contract, the date of Shafer's notification is irrelevant to determining whether a contract was in effect, and if so, which one. The decision to consolidate and the transfer of Robert Ebert into the new

administrative assistant position occurred before December 16, 1984, and thus the old contract applies. To the extent Shafer's transfer breached the contract, that transfer was not effective until January 7, 1985, and thus the new contract would apply. In both cases, the City's analysis must be rejected.

Shafer argues that the contract was breached in four ways. The first revolves around the creation of Robert Ebert's position as a result of the consolidation of accounting functions. Specifically, Shafer cites Article XXIV, § 15 of the old contract, which states:

Nothing in this Agreement shall prevent management from creating new job classifications or extending or decreasing existing job classifications provided each new job classification is posted for bid in accordance with the bidding procedures described herein.

The language of this section clearly gives the City the right to terminate (or "decrease") Shafer's accounting position. Shafer's argument instead focuses on the requirement that "new job classifications" must be posted for bid, claiming that Ebert's job should have been posted, and that this provision was breached when it was not so posted.

The essential premise of Shafer's argument is that Ebert's new position is a "new job classification" subject to Article XXIV, § 15. An examination of the entire collective bargaining agreement reveals that this premise is untrue. Not all jobs which affect the fire department are covered by the contract; the union bargains for the firefighters only, and thus some jobs are outside the scope of its representation. In Article IV of the contract, the union specifically recognizes the City's right to "transfer work or otherwise perform work in the Fire Department," thus allowing for the

ments about the grievance procedure in *Knapp* came from several teachers, and were about teachers in general. The collective bargaining agreement advocated in *McGill* affected all teachers. Here, Shafer's focus was much narrower; he spoke to protect his own interest as a

platoon captain, and was concerned only about how the contract would affect him, as evidenced by his questions at the union meeting on the second proposal. Thus, the context and content of Shafer's remarks make his speech a matter of personal concern in this case.

performance of Department work by City (and, therefore, non-union) employees.

██ Thus, a reasonable interpretation of the "new job classification" language of Article XXIV, § 15 is that it applies only to new job classes created for firefighters. Such an interpretation makes sense in light of the fact that Article XXIV, which sets forth bidding procedures, mandates that department seniority control in bidding for job openings in the department. When a job is created for firefighters to fill, seniority and other such union processes can play a role in sorting out which firefighter should get the job. However, when the City assumes certain work and assigns City employees to do that work, it makes no sense for the bidding process to be employed because the City is not looking to the firefighters to perform the work.

██ This implicates Shafer's second argument about Ebert's position: that assignment of bargaining unit work to non-bargaining unit personnel is as a matter of law a violation of the agreement. The court disagrees. While Shafer cites several arbitrator's decisions, he fails to indicate that the contract provisions involved in those cases are similar to the contract here. In Article IV, the union specifically allows the City the right to transfer and perform work of the department. Such a provision clearly contemplates work being done by City employees who would not be members of the bargaining unit. Ebert's position is a City employee position, and therefore is outside the bargaining unit. Article IV justifies the creation of the position, and the reasonable interpretation of Article XXIV, § 15 set forth here indicates that such a position need not be posted for bid. Therefore, the court finds that the creation of and failure to post bids for Ebert's position does not violate the collective bargaining agreement.

██ The second and third alleged violations of the contract revolve around Shafer's activity in advocating rejection of the contract. Article VII, § 1 provides that

> The City will not interfere with, restrain or coerce ... [or] discriminate in respect to hire, tenure of employment or any term or condition of employment against any employee covered by this Agreement because of membership in, or activity on behalf of, the Union....

Article XX, § 6 of the old contract (Article XXII, § 6 of the new contract) specifically provides that "Unit members shall not receive any discipline for exercising their rights as a citizen guaranteed by the Constitution of the United States and the State of Indiana." Shafer argues that these provisions were violated when the consolidation of accounting functions and his transfer were implemented because of his speaking out against the contract. However, the court has specifically found that both the consolidation and transfer were not undertaken in response to any activity by Shafer; thus, it is impossible for the City to have interfered with, discriminated against, or disciplined Shafer because of his advocacy. Therefore, these provisions of the contract could not have been breached.

The final breach of contract claim is based on the language of Article XX, § 8 of the old, and Article XXII, § 8 of the new, contract, which states:

> Unit members shall not be demoted, except for just cause and after appropriate hearing and determination by the Board of Safety....

Shafer claims he was "demoted" or "constructively demoted" because his transfer moved him from a 40-hour per week job to a 56-hour per week job, even though he admittedly suffered no loss in rank, pay, or benefits.

██ The court finds that an increase in the number of hours worked is not a demotion under the terms of the contract. A distinction between demotions and changes in the number of hours worked is implicit in the language of Article IV, in which the union recognizes the authority of the City to, *inter alia,* "demote" and "assign work and the number of hours to be worked." The fact that the contract delineates these as separate powers of the City

suggests that the union knew there was a difference between the two. The traditional conception of demotion is tied directly to a lowering of rank; no such event occurred in this case. Shafer has maintained the same status in the department; he is simply required to work longer than he did before. The court concludes that Shafer was not "demoted" so as to require the procedural protections of § 8. Therefore, no breach of contract occurred.

Shafer has failed to establish that any breach of the collective bargaining agreement occurred. Therefore, the defendants are entitled to judgment on Count IV of the amended complaint.

*Municipal Ordinances and Regulations*

Shafer's final claim relates to the violation of the City's Municipal Code, and the personnel policies promulgated under it. Article I, § 20–2 requires all City departments to conform to official City personnel policies. Shafer contends that the City violated its personnel policy by failing to post Ebert's position for bidding in accordance with those policies.

Betty Collins, the City's personnel director, testified that under the City's interpretation of, and practice under, City personnel policy, there was no need to post for bidding the consolidated accounting/administrative position filled by Ebert. According to Collins, Ebert filled the position by a "lateral transfer"—that is, a transfer from one department or division to another with the same labor grade. Ebert had been an administrative assistant to the Director of the Board of Works, and his transfer to be administrative assistant to the Director of the Board of Safety was considered "lateral" so as not to justify the posting of job bids.

An examination of the City's policies confirms this analysis. Policy 7.1, which relates to transfers, allows for transfers to fill positions created by internal reorganiza-tions of a department or function. Collins' interpretation of this policy as exempting reorganization transfers from the bidding process is reasonable in light of the City's entire policy[4] and practice concerning lateral transfers.

The court also points out that Shafer has failed to show how he was harmed in any way by the failure to post bids for Ebert's position. Shafer cannot claim that his transfer out of his accounting position (which gives rise to his only claim of "damage"—the increase in work hours) was caused by the failure to post bids; the transfer was the result of the decision to consolidate, which is not governed by the City personnel policies at issue here. This implicates Shafer's standing to bring this claim. However, whether Shafer has standing or not, the court finds that the City's personnel policies were not violated by the failure to post Ebert's position for bidding, and thus Shafer's final claim must fail as well.

This Memorandum of Decision contains the court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir. 1982).

*Conclusion*

The plaintiff has failed to establish by a preponderance of the evidence any violation of his rights of freedom of speech or association, any breach of the collective bargaining agreement between the City and the firefighter's union, or any violation of municipal regulations concerning the posting of bids for City jobs. Therefore, the court hereby enters judgment for the defendants.

---

**4.** Additional support for this conclusion is found in Policy 4.1(C)(8), which allows "confidential positions" (such as administrative assistant) to be filled by recruitment, which is funda-mentally different from bidding. The fact that confidential positions are so distinguished strongly suggests that they should be viewed differently under City policy.